IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JUDGE JANE A. RESTANI

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | Consol. Court.  12-00164 |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., AND | ) | **NON-CONFIDENTIAL** |
| SAMSUNG ELECTRONICS AMERICA, INC., | ) | **VERSION** |
| Defendant-Intervenor, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LG ELECTRONICS, INC., AND | ) | |
| LG ELECTRONICS USA, INC., | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS RULE 56.2 MOTION

John D. Greenwald
James R. Cannon Jr.
Jack A. Levy
Thomas M. Beline
CASSIDY LEVY KENT (USA) LLP
2000 Pennsylvania Avenue N.W.
Suite 3000
Washington, D.C. 20006
(202) 567-2300

January 22, 2013

PROPRIETARY INFORMATION DELETED

## Table of Contents

Page

I.  RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT ....................................1

II.  STATEMENT OF THE CASE .......................................................................................5

    A.  Background.........................................................................................................5

    B.  The Preliminary Determination .........................................................................6

    C.  The Final Determination.....................................................................................7

        1.  Substantial Overlap of Competition ......................................................8

        2.  Underselling.........................................................................................10

        3.  Price Effects/Lost Sales ......................................................................11

III.  ARGUMENT ...........................................................................................................13

    A.  Standard of Review..........................................................................................13

    B.  The Commission's Conclusion that the Significant and Increasing Volume
        of Subject Imports Had No Impact on the Domestic Industry Was Wrong
        as a Matter of Both Fact and Law .....................................................................15

        1.  The Commission's Finding of "Attenuated Competition" between
            Subject Imports and the Domestic Like Product Was Based Upon a
            Calculation Error and Is Not Supported by the Record ...........................16

        2.  The Commission Compounded its Calculation Error by Essentially
            Ignoring the Fact that Whirlpool Introduced its Own  Four Door
            Refrigerator Prior to the Substantial Increase in Subject Import
            Sales of Such Refrigerators.......................................................................18

        3.  Correcting the Commission's Double Counting Error, and
            Recognizing that [                    ] in Subject Imports of
            Four Door Models Occurred After Whirlpool Had Introduced Its
            Competing Model, Reveals a Very Substantial Overlap in
            Concededly Direct Competition Between Subject Imports and the
            Domestic Like Product .............................................................................19

        4.  The Commission's Segmentation of the Market By Reference to
            27.5 Cubic Feet Capacity Was Arbitrary, and Its Finding that
            Competition Between "Jumbo" Imports and Domestic
            Refrigerators Was "Attenuated" Is Unsupported by Substantial
            Evidence.....................................................................................................21

C.   The Commission's Conclusions Regarding the Price Effects of Subject
     Imports on the Domestic Industry are Wrong as a Matter of Fact and Law..........24

     1.   The Commission's Underselling Analysis Was Badly Flawed.................24

          a.   The Commission's Finding of No Significant Price
               Underselling by Subject Imports Is Contradicted by the
               Data......................................................................................24

          b.   As a Matter of Law, the Commission Impermissibly
               Ignored Feature Differences in its Underselling Analysis.............26

          c.   The Commission Improperly Refused to Consider LG's
               Pricing Data Separately from Samsung's.....................................28

     2.   The Commission Misapplied the Statute in its Analysis of Price
          Depression and Price Suppression and Reached Findings
          Regarding Both that Are Unsupported by Substantial Evidence...............31

          a.   The Commission Ignored Evidence of the Clear Correlation
               Between Price [

                    ].......................................................................................31

          b.   The Commission Improperly Ignored Explicit Testimony
               by Samsung's Witness that the Pricing of Samsung's
               Product 6A Forced Whirlpool to Discount its Own Product
               6A Prices................................................................................35

          c.   The Commission's Efforts to Explain the Fall in Domestic
               Producer Prices over the Period of Investigation by
               Reference to (1) Market Segmentation, (2) the Absence of
               Price Underselling, and (3) the Life Cycle of Bottom
               Mount Refrigerators Fail on the Law and the Record
               Evidence.................................................................................36

          d.   The Commission's Price Suppression Analysis Is Also
               Wrong on Both the Law and the Facts .........................................39

D.   The Commission's Analysis of a Domestic Industry Lost Sale Is
     Inconsistent with Section 771(7)(C)(iii)(V) of the Act and Is Otherwise
     Unsupported by Substantial Evidence ...................................................41

E.   Upon Remanding the Commission's Decision for Reconsideration of the
     Foregoing Issues, the Court Should Direct the Commission to Reconsider
     Its Determination Regarding the Impact of Subject Imports in Light of
     Any New or Different Findings.........................................................43

**PROPRIETARY INFORMATION DELETED**

IV.   CONCLUSION..................................................................................................................45

PROPRIETARY INFORMATION DELETED

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1516a.................................................................................13

19 U.S.C. § 1677.............................................................................*passim*


Court Decisions

*Altx, Inc. v. United States*, 25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ........................................14

*Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419
U.S. 281 (1974).................................................................................14

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................................14

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.
837 (1984).................................................................................15

*Companhia Paulista de Ferro-Ligas v. United States*, 21 CIT 473 (1996)...................................32

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........................................................14

*Diamond Sawblades Mfrs. Coalition v. United States*, 32 CIT 134 (2008) ...................................44

*Diamond Sawblades Mfrs. Coalition v. United States*, Slip Op. 09-5, 2009
Ct. Int'l Tr. LEXIS 6 (2009) ...................................................................20

*Diamond Sawblades Mfrs. Coalition v. United States*, 612 F.3d 1348 (Fed.
Cir. 2010).................................................................................20

*GEO Specialty Chems. Inc. v. United States*, Slip Op. 09-13, 2009 Ct. Intl.
Tr. LEXIS 12 (2009).................................................................................31

*Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369 (Fed.
Cir. 2003).................................................................................14

*Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302 (Ct. Int'l
Trade 2006).................................................................................14

*International Union v. NLRB*, 459 F.2d 1329, 1341 (D.C. Cir. 1972) .........................................31

*Maine Potato Council v. United States*, 9 CIT 460, 617 F. Supp. 1088
(1985)....................................................................................................................3, 26

*Maine Potato Council v. United States*, 9 CIT 293, 297, 613 F. Supp. 1237,
1239 (1985),.................................................................................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29
(1983)...........................................................................................................................30

*Nevinnomysskiy Azot v. United States*, 32 CIT 642, 565 F. Supp. 2d 1357
(2008)...........................................................................................................................35

*Nucor Fastener Div. v. United States*, 791 F. Supp. 2d 1269 (Ct. Int'l Trade
2011)............................................................................................................................30

*R-M Industries v. United States*, 18 CIT 219, 848 F. Supp. 204 (1994)................................27, 32

*Shandong TTCA Biochemistry Co. v. United States*, 774 F. Supp. 2d 1317
(Ct. Int'l Trade 2011) .............................................................................................14, 32

*United States Steel Group – A Unit of USX Corp. v. United States*, 18 CIT
1190, 873 F. Supp. 673 (1994) ...................................................................................44

Administrative Determinations

*Bottom Mount Combination Refrigerator-Freezers from Korea and Mexico*,
Inv. Nos. 701-TA-477 and 731-TA-1180-1181 (Preliminary), USITC Pub.
4232 (May 2011) .................................................................................................*passim*

*Diamond Sawblades and Parts Thereof from Korea and China*, Inv.
731-TA-1092 and 1093 (Final) (Remand), USITC Pub. No. 4007
(May 2008) ..................................................................................................................21

**PROPRIETARY INFORMATION DELETED**

On behalf of Whirlpool Corporation ("Whirlpool"), Plaintiff in this action, we hereby file the following memorandum in support of Plaintiff's motion for judgment on the agency record.

## I.    RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

The administrative determinations challenged in this action are the negative final determinations of the U.S. International Trade Commission ("the Commission") pursuant to 19 U.S.C. §§ 1671d(b) and 1673d(b) in the antidumping and countervailing duty investigations concerning bottom mount combination refrigerator-freezers ("refrigerators") from the Republic of Korea, published in *Bottom Mount Combination Refrigerator-Freezers from Korea and Mexico,* Inv. Nos. 701-TA-477 and 731-TA-1180-1181 (Final), USITC Pub. 4318 (May 2012) (hereinafter "P.R. 213").[1]  The Commission's final determinations are not supported by substantial evidence and are otherwise not in accordance with law.

A.    The Commission, contrary to the record evidence, concluded that competition between subject imports and the domestic like product was "attenuated."  That finding was not supported by substantial evidence for several reasons:

1.    The Commission arbitrarily defined a "jumbo" segment of the market, then miscalculated the size of the "jumbo" market segment by double-counting the volumes for four door "jumbo" refrigerators.

2.    The Commission ignored record evidence that [      ] percent of subject import shipments of four door models occurred *after* Whirlpool had introduced its competing four door models.  The record thus contradicted the conclusion that Whirlpool was a "late

---

[1] Citations are denoted by reference to the document numbers assigned to the Public Record ("P.R.") and Confidential Record ("C.R."), as identified in the Index of the Administrative Record, filed August 27, 2012, in the captioned action.

**PROPRIETARY INFORMATION DELETED**

entrant" or that competition was "attenuated" because the domestic industry did not offer a four door model in time to meet the increase in market demand.

    3.    The Commission ignored the record evidence of a very substantial overlap of direct competition between subject imports and the domestic like product, focusing instead on the (miscalculated) segment data for so-called "jumbo" and four door refrigerators.  The market segment where subject imports and the domestic like product were, by the Commission's own methodology, directly competitive – *i.e.*, refrigerators under 27.5 cubic feet in capacity and excluding four door models prior to the third quarter 2010 — accounted for [      ] to [      ] percent of total consumption during the period of investigation.  Using the Commission's own methodology, the record evidence thus contradicts the conclusion that the increase in subject imports did not impact the domestic industry.

    4.    The Commission's finding that the refrigerator market was segmented into so-called "jumbo" models equal to or above 27.5 cubic feet in internal capacity and "regular" models below 27.5 cubic feet in internal capacity was arbitrary, unsupported by record evidence, and contradicted by the Commission's own preliminary determination.

    B.    The Commission ignored evidence of underselling, refused to take account of the impact of features on prices, and failed to adjust its analysis to account for the fact that LG had submitted unreliable pricing data both to Commerce and to the Commission.  As such, its finding that imports did not undersell domestic producer prices to a "significant" extent was not supported by substantial evidence and otherwise contrary to law, to wit:

    1.    The Commission's aggregate assessment of the degree of underselling over Products 1A, 2A, 4A and 6A ignored [                         ] in Products [

**PROPRIETARY INFORMATION DELETED**

]. Instead, the Commission relied upon aggregate comparisons including Product 6A, where greater capacity and feature load differences could distort the price comparisons.

2.     The Commission refused to adjust the pricing data to account for differences in features between the subject imports and domestic industry comparison models, as required by this Court's decision in *Maine Potato, infra*.  As such, the Commission's finding was both unsupported by record evidence and contrary to law.

3.     Nowithstanding evidence that one foreign producer, LG, submitted unreliable information concerning its indirect rebates, the Commission failed to separately analyze the pricing data submitted by LG and Samsung, respectively, for its underselling analysis.

C.     Despite having found that domestic industry prices for certain products decreased over the period of investigation and that the domestic industry was unable to raise prices to cover its increasing costs of production, and despite the uncontested fact that subject imports were essentially the only other major source of supply in the market, the Commission found that competition with subject imports did not impact domestic producers' prices through price depression or suppression.  The Commission's findings are unsupported by substantial evidence or contrary to law, as follows:

1.     The Commission's conclusion that a [       ] record of underselling precluded a finding of price depression or suppression ignores the statutory instruction to assess price depression and suppression apart from price underselling.

2.     The Commission's finding that neither the decline in U.S. producer prices nor the inability of the domestic industry to raise prices to cover rising costs was by reason of subject imports ignored the quarterly price underselling and volume data for product categories

**PROPRIETARY INFORMATION DELETED**

[                                                    ] in U.S. producer prices

and [                                    ], as well as the testimony of

Samsung's own witness regarding pricing for Product 6A.

3.      With respect to the conclusion that declining domestic prices were

attributable to "life cycle" pricing, the Commission ignored its own finding that the "typical life

cycle" lasted at least two to three years and the data showing substantial declines in domestic

prices within one year of the introduction of domestic models.  Instead, the Commission

incorrectly, unreasonably, and without explanation, concluded that the substantial declines in

domestic industry prices that occurred within one year after new models were introduced were

the result of "life cycle" pricing.

D.      The Commission improperly discounted evidence that price was a factor in the

domestic industry's loss of [                    ] in OEM sales to [

].  The Commission's findings were unsupported by substantial evidence on the record, as

follows:

1.      The Commission concluded that the [        ] sale was not lost on the basis

of price despite record evidence that [        ] insisted that its [                ] suppliers

provide it with refrigerators that are [

].

2.      The Commission also impermissibly failed to consider whether the

difference between Whirlpool's bid price and [        ] price [                    ] only

because [        ] bid price was a dumped price.

E.      With respect to each of the above-referenced findings — included its erroneous

finding of "attenuated competition" — the Commission concluded that subject imports did not

**PROPRIETARY INFORMATION DELETED**

"impact" the domestic industry within the meaning of 19 U.S.C. § 1677(7)(C)(iii). Insofar as these findings are unsupported by substantial evidence or otherwise not in accordance with law, the Commission also needs to reassess the "impact" by subject imports.

## II.    STATEMENT OF THE CASE

### A.    Background

On March 30, 2011, Whirlpool filed a petition with the Department of Commerce and the Commission alleging material injury to domestic producers of refrigerators due to dumped imports from Mexico and dumped and subsidized imports from Korea. *Bottom Mount Combination Refrigerator-Freezers from Korea and Mexico*, 76 Fed. Reg. 19125 (Apr. 6, 2011), P.R. 8.

"Bottom mount refrigerators" are combination refrigerator-freezers in which the freezer compartment is located below the refrigerator compartment and is typically accessed through one or two doors or drawers. P.R. 213 at I-5-6, I-9-10. In so-called "four door" models, there are two side-by-side doors to access the top refrigerator compartment ("French doors") and two drawers below the primary refrigerator compartment, at least one of which accesses a bottom-mounted freezer compartment. *See* P.R. 213 at I-10 (including photos of each configuration).

Bottom mount refrigerators are not only produced in different configurations (*e.g.*, two-door, three-door, four-door), but "are available in a range of depths (counter depth versus standard depth), widths (30, 33, or 36 inch), and capacities." P.R. 213 at I-9. The external dimensions are designed to fit into residential kitchen spaces. P.R. 213 at I-13. The refrigerators are offered with a variety of product features, including "(1) the Energy Star (or E-star) rating, (2) capacity, (3) twin cooling (or dual evaporators), (4) external ice and water dispensers, and

PROPRIETARY INFORMATION DELETED

(5) LED lighting." P.R. 213 at I-12.  Internal capacity of the refrigerators generally ranges up to 29 cubic feet.  P.R. 213 at I-13.

### B.    The Preliminary Determination

On May 23, 2011, the Commission published unanimous affirmative preliminary injury determinations, finding a reasonable indication of material injury to the U.S. bottom mount refrigerator industry by reason of cumulated imports of bottom mount refrigerators from Korea and Mexico.  *Bottom Mount Combination Refrigerator-Freezers from Korea and Mexico*, Inv. Nos. 701-TA-477 and 731-TA-1180-1181 (Preliminary), USITC Pub. 4232 (May 2011), P.R. 71.

In the course of the preliminary investigation, the Commission refused to segment the refrigerator market by reference to capacity, either at 25.5 cubic feet or 27.0 cubic feet.  In particular, respondents argued that any increase in subject imports was not "significant" because the "increase occurred in a segment of the market – multi-door bottom mount refrigerators with a capacity of 25.5 cubic feet or more – that was allegedly under-served by the domestic industry." P.R. 71 at 20, n.139.  The Commission rejected this argument, finding "a significant quantity of sales of both domestically produced and subject imported" refrigerators over 25.5 cubic feet in capacity.  *Id.*

The Commission likewise rejected the argument that a so-called "jumbo" segment of the market, defined to be over 27.0 cubic feet in capacity, was under-served by the domestic industry:[2]

---

[2] The Commission referenced so-called "jumbo" refrigerators, "with an interior measuring 27 cubic feet or more" and "regular capacity" with capacity below 27 cubic feet. P.R. 71 at 5.  The terms "jumbo" and "regular," however, were not attributed to any members of the industry.

**PROPRIETARY INFORMATION DELETED**

> We are similarly unpersuaded by Samsung's argument that the increase in subject import volume attributable to subject imported bottom mount refrigerators in the "jumbo" capacity segment cannot be deemed significant because "U.S. producers do not offer a bottom mount refrigerator in this size range." Samsung Postconference Brief at 14-15. Samsung itself compares a Whirlpool model with LG and Samsung models competing in the "jumbo" segment of the bottom mount refrigerator market. *Id.* at 26. Moreover, witnesses for LG testified at the conference that Whirlpool's 27 cubic foot bottom mount refrigerator model competes with LG's 28 cubic foot model and Samsung's 29 cubic foot model in the "big capacity" segment. See Conference Transcript at 107, 151 (Herring), 152 (Cunningham); *see also* Samsung Exhibit Accompanying the Testimony of James Politeski at 2. There also is evidence that a bottom mount refrigerator's practical capacity can differ from its rated capacity depending on the model's features and layout, such that a one to two cubic foot difference between bottom mount refrigerator models in terms of their rated capacity could make no practical difference in terms of their usable capacity. See Samsung's Postconference Brief at 33; LG's Postconference Brief at 6-7.

P.R. 71 at 21, n. 139.

The Commission thus rejected the invitation to segment the market. It then went on to consider the statutory factors, ultimately finding a reasonable indication of material injury:

> In sum, subject import volume and market share increased significantly during the period examined, undersold the domestic like product to a significant degree, leading to significant declines in most indicators of domestic industry performance. Therefore, for purposes of the preliminary phase of these investigations, we conclude that subject imports had a significant adverse impact on the domestic industry.

P.R. 71 at 27.

## C.   The Final Determination

Following the Commission's preliminary determination, Commerce made final affirmative determinations of dumping and subsidization. 77 Fed. Reg. 17413 (Dep't of Commerce Mar. 26, 2012), 77 Fed. Reg. 17410 (Dep't of Commerce Mar. 26, 2012), 77 Fed.

**PROPRIETARY INFORMATION DELETED**

Reg. 17422 (Dep't of Commerce Mar. 26, 2012).[3]   Thereafter, on May 15, 2012, the

Commission published its final determinations that cumulated imports of dumped and subsidized

refrigerators from Korea and dumped refrigerators from Mexico had neither caused nor

threatened to cause material injury to the domestic industry.  P.R. 197; P.R. 213.

The Commission found that the financial condition of the domestic industry was

declining, that imports were significant and increasing both absolutely and relative to domestic

consumption and production, that U.S. producers' prices were declining, and that U.S. producers

were facing a cost-price squeeze from rising costs as their price levels eroded.  P.R. 213 at 40.

Nevertheless, the Commission concluded that there was "no causal connection between the

subject imports and the domestic industry's declining financial performance...."  *Id.*

The Commission summarized its findings as follows:

> In sum, we have found that the increase in subject import volume
> and market share, although significant, did not displace a
> significant volume of domestic industry U.S. shipments.  We have
> also found no significant subject import price underselling and no
> significant price depression or suppression by reason of subject
> imports.  Consequently, we find that the subject imports did not
> have a significant adverse impact on the domestic industry.

*Id.*, at 41.

### 1.  Substantial Overlap of Competition

The record established that there was substantial overlap between subject imports and

domestic refrigerators throughout the period of investigation.  *See* Section III(B)(3), *infra*, and

**Confidential Exhibit 2**.  In fact, the segment of the market in which both subject imports and

domestic producers offered directly competitive models — *i.e.*, that portion of the market

---

[3] Copies are included in the Commission's published opinion, P.R. 213, Appendix A.

**PROPRIETARY INFORMATION DELETED**

excluding so-called "jumbo" models and four-door models before the time when they were offered by Whirlpool in Q3-2010 — accounted for no less than [    ] percent of refrigerator sales in each year of the period of investigation.

In analyzing the impact of subject imports, however, the Commission did not address the [    ] percent of the market where subject imports and domestic like products were competing head-to-head at the same retail accounts on the basis of the same capacity and features. *E.g.*, C.R. 180 at 40-43, 63-65; P.R. 213 at 27-29, 40-41. Instead, the Commission's final negative determinations were based on the conclusion that competition between subject imports and the domestic like product was "attenuated." *E.g.* C.R. 180 at 63-64; P.R. 213 at 40-41. The Commission concluded that there was "attenuated" competition by creating a segment of the market, the so-called "jumbo" segment, above and below 27.5 cubic feet. C.R. 180 at 7; P.R. 213 at 6. It then went on to find that subject imports of four door refrigerators did not impact the domestic industry due to the "late entrance" of Whirlpool into the four-door segment. P.R. 213 at 22.

Because no party drew a line at 27.5 cubic feet and no member of the industry even referenced a category of "jumbo" refrigerators, the Commission had not collected any data from the parties to separate the market above and below 27.5 cubic feet.[4] The Commission therefore estimated the volume of shipments of 27.5-cubic-feet-and-above models. It used "Traqline" data provided in a brief by one of the parties to estimate the "jumbo" portion of the market. P.R. 213 at 23, n. 171. It then added the shipments of Products 2A and 3A to reflect the four-door segment of the market. *Id.*

---

[4] Indeed, even the revisions to the final staff report circulated after all of the briefs were filed do not include any estimates of this newly defined "jumbo" segment. C.R. 178, 179.

**PROPRIETARY INFORMATION DELETED**

As explained in detail below, in Section III(B)(1), the Commission's estimate double-counted four door refrigerators that were also over 27.5 cubic feet in capacity.  Furthermore, its analysis ignored the fact that domestic shipments of four door refrigerators had commenced in the third quarter 2010, [                                                                                    ], and were not at all "late entrants."  *See* Section III(B), *infra*, and **Confidential Exhibit 1**.  Thus, the finding of "attenuated competition" not only departed from the preliminary determination, it was based upon double-counting and disregarded the domestic industry's shipments of four door refrigerators.

If the double-counting error is corrected and if domestic shipments of four door models are not ignored, subject imports in the overlapping segment of the market [                              ] units in 2009 to [              ] units in 2011, [

] percentage points at the same time as the domestic industry share in the segment [

] percentage points.  **Confidential Exhibit 2**.

### 2.  *Underselling*

In its preliminary determination, the Commission found that "subject imports pervasively undersold the domestic like product … at significant margins of underselling."  C.R. 59 at 32; P.R. 71 at 22.  In the final phase of the investigation, the Commission reached the opposite conclusion.  P.R. 213 at 34.  In doing so, the Commission insisted that the underselling data must be analyzed on a aggregate basis, simply counting the number of instances of underselling without regard to the products being compared or the reliability of the data.

In terms of capacity, Products 1A, 2A and 4A each allowed for a range of 0.9 cubic feet.  P.R. 213 at V-9-10.  Product 6A, in contrast, specified total capacity of 24.5–26.4 cubic feet, a

**PROPRIETARY INFORMATION DELETED**

range of 1.9 cubic feet.  P.R. 213 at V-10.  Moreover, Product 6A [

]. *See, e.g.,* C.R. 180 at

48, n.229; C.R. 169 at V-19; P.R. 213 at 32, n.229 and V-10.  The product definitions for

Products 1A, 2A and 4A thus [

] than did the definition for Product 6A.

The record, however, established that subject imports undersold domestic producers

prices [                                                                           ] which were defined more

narrowly to limit the product mix.  C.R. 169 at V-57, V-61; C.R. 179 at Table V-20.  To analyze

these data, however, the Commission simply counted the number of instances of underselling,

treating Products 1A, 2A, 4A and 6A equally.  C.R. 180 at 51-52; P.R. 213 at 34.  It did so

without regard to the product mix problem raised by the Product 6A data and without making

any adjustments to account for these differences in physical characteristics.

Moreover, the record established that pricing data submitted by LG were unreliable.  *E.g.,*

C.R. 180 at 50-51; P.R. 213 at 33-34.  Nevertheless, the Commission refused to make additional

pricing comparisons to separately compare domestic prices to LG and Samsung, respectively, for

purposes of analyzing underselling.  C.R. 180 at 48-51; P.R. 213 at 32-34.

3.  *Price Effects/Lost Sales*

Having dismissed the evidence of underselling as not "significant," the Commission then

turned to the evidence of price depression or suppression.  The record established and the

Commission acknowledged that the domestic industry was losing market share, domestic prices

were declining, the domestic industry was suffering a cost-price squeeze, and the industry was

losing money.  *E.g.,* C.R. 180 at 54, 62-64; P.R. 213 at 36, 39-40.  The Commission concluded,

11

**PROPRIETARY INFORMATION DELETED**

though, that the domestic industry was not significantly impacted by the price effects of subject imports.

First, the Commission repeated its conclusion that the evidence of price underselling was not "significant." C.R. 180 at 51-52, 65; P.R. 213 at 34-35, 41.  It then concluded that, although domestic producer prices were declining, the decline was not by reason of subject imports but because of the "life cycle" for refrigerator models.  C.R. 180 at 53-55 and 64; P.R. 213 at 36-38 and 40.  The Commission also discounted the evidence that the domestic industry had lost sales at [      ] to competition from [      ].  C.R. 180 at 56; P.R. 213 at 37.

With respect to the "life cycle," the record demonstrated that new refrigerator models had a minimum life cycle of at least two to three years.  C.R. 180 at 23; P.R. 213 at 16.  But, in the case of three of the four products for which there were comparisons available between subject imports domestic producer prices, U.S. producer prices fell to levels [

].  C.R. 169 at V-60, V-64; C.R. 179 at V-58.

Regarding lost sales, the record established that Whirlpool lost a major OEM sale to subject imports in its bid [                                      ].  *See, e.g.,* C.R. 169 at V-90, n.58.  [

]."  C.R. 180 at 57, *citing* C.R. 169 at V-90.  [

].  C.R. 180 at 59; C.R. 134 at 46-47; C.R. 150 at 6.  Furthermore, [

].

C.R. 134 at 43-44.  Although recognizing that [

PROPRIETARY INFORMATION DELETED

]," the Commission unreasonably concluded that the sale was lost to subject imports for reasons other than price. C.R. 180 at 59, n. 284; *see also* C.R. 180 at 56-57; P.R. 213 at 37. Notably, the Commission impermissibly failed to consider whether the difference between Whirlpool's bid price and [      ] price [                              ] only because [      ] bid price was a dumped price.

More generally, the record established that subject imports accounted for the vast majority of imports in the market and were the only viable alternative to domestic production to supply the market throughout the period of investigation. P.R. 213 at 17; C.R. 180 at 24; *see also* C.R. 178 at Table IV-8. In those circumstances, if subject imports did not impact the domestic industry, why would U.S. producers *choose* to lower their prices to below-cost levels? Elsewhere, in fact, the Commission acknowledged "Whirlpool's need to cut prices in 2011" in response to what the Commission believed to be "the qualitative superiority of subject imports." P.R. 213 at 40. Having thus recognized a cause and effect relationship between domestic producer prices and subject imports, it could not rationally conclude that subject imports had no material impact on U.S. producer prices.

## III.    ARGUMENT

### A.    Standard of Review

To be sustained, the Commission's determination of whether subject imports caused "material injury" to the domestic industry must be supported by "substantial evidence" on the record as a whole, and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). Many of the issues raised by this appeal involve the sufficiency of the evidence on which the Commission's final determination rests. The Commission is entitled to deference in weighing the evidence, but its findings must be grounded in "such relevant evidence as a reasonable mind

**PROPRIETARY INFORMATION DELETED**

might accept as adequate to support a conclusion." *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Deference to agency expertise does not excuse material errors of arithmetic, misstatement of the evidence, or conclusions of fact that are unsupported by the record as a whole.  Nor does deference to the agency's assessment of the evidence permit the Commission to apply a standard of causation that is inconsistent with the statute.

In justifying its determination, the Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions," *Altx, Inc. v. United States*, 25 CIT 1100, 1117-18, 167 F. Supp. 2d 1353, 1374 (2001), and must articulate a "rational connection between the facts found and the choice made." *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 285 (1974) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  In this regard, the statutory factors enumerated by Section 771(7) of the Act are not a checklist; the Commission "cannot simply not{e} a potential factor and issu{e} a conclusory assertion that such a factor did or did not play a major role in causing a material injury." *Shandong TTCA Biochemistry Co. v. United States*, 774 F. Supp. 2d 1317, 1332 (Ct. Int'l Trade 2011) (quoting *Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302 (Ct. Int'l Trade 2006)).  Rather, the Commission must analyze all of the statutory factors and provide a rational explanation for its decision on the basis of the entire record.

Finally, with respect to its application of the statute, the Commission must apply the plain language of the statute or, if the statute is ambiguous, the Commission's statutory interpretation must be otherwise reasonable. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,

**PROPRIETARY INFORMATION DELETED**

467 U.S. 837, 842-43 (1984) ("the issue for the court is whether the agency's answer is based on a permissible construction of the statute").

> **B.     The Commission's Conclusion that the Significant and Increasing Volume of Subject Imports Had No Impact on the Domestic Industry Was Wrong as a Matter of Both Fact and Law**

The first "relevant factor" that the Commission must consider in assessing whether the domestic industry has been materially injured by reason of subject imports is "whether the volume of imports of the merchandise, or any increase in the volume, either in absolute or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i).  The Commission found that "the volume of cumulated subject imports ... increased significantly, both absolutely and relative to apparent U.S. consumption and production...." C.R. 180 at 40-41; P.R. 213 at 29.  Nevertheless, the Commission concluded that the significant and increasing volume of subject imports did not have a significant impact on the domestic industry.  According to the Commission:

> An important factor behind the domestic industry's declining market share was Whirlpool's lack of a jumbo capacity bottom mount refrigerator and its introduction of a four door bottom mount refrigerator only in the third quarter of 2010, two years after the introduction of subject imported four door models.  Both types of bottom mount refrigerators accounted for most of the growth in bottom mount refrigerator demand during the period examined. Specifically, jumbo bottom mount refrigerators accounted for [     ] percent of the increase in apparent U.S. consumption ... during the period examined, while four door bottom mount refrigerators accounted for approximately [     ] percent of the increase.  Indeed, four door and jumbo bottom mount refrigerators accounted for approximately [     ] percent of the increase in subject import U.S. shipment volume between 2009 and 2011. Because most of the increase in subject import volume and market share resulted from increased sales of models that the domestic industry either did not produce or produced only toward the end of the period examined, we do not find that the increase in subject imports came at the expense of the domestic industry.

**PROPRIETARY INFORMATION DELETED**

C.R. 180 at 42-43; P.R. 213 at 28-29 (footnotes omitted).[5]

There are critical errors of fact and/or law in virtually every part of the Commission's analysis, with the result that its finding of "attenuated competition" is unsupported.  Moreover, having found "attenuated competition" on the basis of a flawed calculation, the Commission then discounted the price effects of subject imports and, ultimately, the impact of imports on the domestic industry.

> 1.    *The Commission's Finding of "Attenuated Competition" between Subject Imports and the Domestic Like Product Was Based Upon a Calculation Error and Is Not Supported by the Record*

The Commission's determination that the concededly "significant" volume and rise in volume of subject imports did not displace a significant volume of domestic industry shipments is premised on its erroneous conclusions that [      ] percent of the increase in U.S. consumption over the period of investigation, and [      ] percent of the period rise in subject imports, were accounted for by "jumbo" refrigerators which the domestic industry did not produce, and by four door refrigerator models which the domestic industry introduced "only in the third quarter of 2010." C.R. 180 at 35; P.R. 213 at 40.  As discussed below, the Commission's calculations of the increased demand and the subject imports attributable to "jumbo" and four door models are based on a gross mistake of arithmetic.

---

[5] The Commission also noted that "{a}nother significant portion of the increase in subject import volume and market share between 2009 and 2010 resulted from [
                                                          ]." C.R. 180 at 43; P.R. 213 at 29.  However, it then dismissed the volume effects of this substantial lost sale, inexplicably finding that price was not a significant factor underlying Whirlpool's loss of the business to subject imports, contrary to the record evidence. C.R. 180 at 43; P.R. 213 at 29. *See* Section III(D), *infra.*

**PROPRIETARY INFORMATION DELETED**

The Commission attributed [      ] percent total increase in demand to "jumbo" and four

door models by aggregating its calculations of the proportion of the increased demand accounted

for by each type of model.  Specifically, the Commission calculated that "jumbo bottom mount

refrigerators accounted for [      ] percent of the increase in apparent U.S. consumption" and

that "four door bottom mounts accounted approximately [      ] percent of the increase."  C.R.

180 at 42; P.R. 213 at 28.  The [      ] percent is the sum of these two figures, *i.e.,* [

].  C.R. 180 at 35, n.171, and 42; P.R. 213 at 23, n.171, and 28.

It was incorrect factually, however, for the Commission to add these two percentage

figures together.  The estimate of the volume of so-called "jumbo" refrigerators sold in the

United States from 2009 to 2011 was based upon "Traqline" data, which are monthly internet

survey data showing sales of refrigerators by capacity.  C.R. 180 at 35, n.171; P.R. 213 at 23,

n.171.[6]  The Commission then added to this "jumbo" estimate the volume reported for the two

"four door" products for which price and quantity data were collected, *i.e.,* Products 2A and 3A.

C.R. 180 at 35, n.171; P.R. 213 at 23, n.171.

*However, Product 3A was defined to include four door refrigerators with a capacity of*

*27.5 cubic feet or more, that is, "jumbo" four door refrigerators.*  *See* P.R. 213 at V-9 and V-10

(defining Product 3A).  Thus, the Commission had already counted these Product 3A imports in

its estimate of the jumbo segment of the market.  *By simply adding  the "jumbo" and "four*

---

[6] Since there was no request for analysis of so-called "jumbo" bottom mount refrigerators, the
staff did not collect data separately for such a product segment.  Accordingly, the Commission
derived these data by utilizing monthly internet survey data of consumers (who purchased from
retailers) on the ratio of jumbo to total refrigerator consumption in order to approximate the
volume of sales of jumbo refrigerators for each year of the period of investigation.  *See* C.R. 180
at 35, n.171; P.R.  213 at 23, n.171.

**PROPRIETARY INFORMATION DELETED**

*door" model calculations, the Commission double counted all of the four door refrigerators in*

*Product 3A that were already reflected in the jumbo refrigerator calculation.*

The [      ] percent calculation thus grossly *overstates* the extent to which the increase in

U.S. consumption from 2009 to 2011 represented jumbo and four door refrigerators, and further

grossly *understates* the overlap in competition between subject imports and the domestic like

product.  When the double counting is eliminated, the data show that increased demand for

jumbo and four door refrigerators accounted for [      ] percent, *not* [      ] percent, of the

increase in consumption.  *See* **Confidential Exhibit 1**.

This double counting error also affected the Commission's conclusion that "jumbo" and

four door models accounted for "approximately [      ] percent of the increase in subject U.S.

shipment volume between 2009 and 2011."  C.R. 180 at 35, n.171; P.R. 213 at 23, n.171.

However, even if all "jumbo" shipments were properly attributable to subject imports,[7]

correction of the double counting error noted above shows that "jumbo" and four door imports

accounted for [      ] percent of the increase in subject import shipment volumes from 2009 to

2011, *not* the [      ] percent figure cited repeatedly by the Commission.  *See* **Confidential**

**Exhibit 1**.

    2.    *The Commission Compounded its Calculation Error by Essentially*
    *Ignoring the Fact that Whirlpool Introduced its Own Four Door*
    *Refrigerator Prior to the Substantial Increase in Subject Import*
    *Sales of Such Refrigerators*

The Commission correctly states that Whirlpool's four door model was introduced in the

third quarter of 2010, *i.e.*, halfway through the period of investigation.  P.R. 213 at 23; C.R. 180

---

[7] The Commission's calculation assumed without supporting evidence there were no "jumbo" refrigerators sold by other U.S. producers (such as Sub-Zero).  *See* C.R. 169 at III-1, n.1, and VII-21; P.R. 213 at III-1, n.1, and VII-12.

**PROPRIETARY INFORMATION DELETED**

at 35.  The Commission's analysis, however, implies that most of the growth of subject imports

of four door models occurred *before* the third quarter of 2010.  P.R. 213 at 23, 28-29; C.R. 180 at

35, 42-43.  In fact, the data show that [      ] percent of the sales of imported four door

refrigerators from Korea and Mexico occurred after, not before, the second quarter of 2010, that

is, after Whirlpool introduced its four door refrigerators.  C.R. 169 at V-60 and V-62.  *See also*

**Confidential Exhibit 3** (including summary tables showing the pricing data for Products 2A and

3A).

In other words, Whirlpool's sales of four door refrigerators overlapped the sale of [      ]

percent of the sales of the comparable subject imports.  *See* C.R. 169 at V-60 and V-62.  On

these data, there is no basis on which the Commission could have reasonably concluded that

competition between subject four door imports and the domestic like product was "attenuated."

> 3.   *Correcting the Commission's Double Counting Error, and*
>      *Recognizing that [                    ] in Subject Imports of*
>      *Four Door Models Occurred After Whirlpool Had Introduced Its*
>      *Competing Model, Reveals a Very Substantial Overlap in*
>      *Concededly Direct Competition Between Subject Imports and the*
>      *Domestic Like Product*

When the Commission's errors are corrected, the record evidence clearly shows

substantial overlap in concededly direct competition between subject imports and the domestic

like product that precludes a finding of "attenuated competition."  As shown in **Confidential**

**Exhibit 2**, during every year of the period of investigation, subject imports and domestic like

products (excluding "jumbo" models or four door models at least until the third quarter 2010)

accounted for [      ] percent or more of the total market.

Excluding subject imports of "jumbo" models and four door models offered prior to the

third quarter 2010 from the analysis, the volume of subject imports in direct competition with

domestic refrigerators [                                        ] units in 2011.

**Confidential Exhibit 2.** This [          ] in the volume of subject imports represented [          ]

in their share of the market from [              ] in 2009 to [              ] in 2011.  Over the

same period, the U.S. industry's share of this competitive segment of the refrigerator market

[                                    ]. *Id.*

    In short, even accepting (1) the Commission's arbitrary definition of a "jumbo" market

segment, and (2) the equally arbitrary finding that bottom mount refrigerators with an internal

capacity equal to or greater than 27.5 cubic feet do not compete with smaller capacity models,

when the Commission's calculation errors are corrected, the record establishes not only "a

substantial overlap" in the volume of subject imports in direct competition with the domestic like

product under the Commission's analytical framework, but also a [

                                                                                    ].

    The evidence thus refutes the Commission's finding of "attenuated competition" just as

the record in *Diamond Sawblades and Parts Thereof from Korea and China* refuted such a

finding in that case.  *See Diamond Sawblades Mfrs. Coalition v. United States,* Slip Op. 09-5,

2009 Ct. Int'l Tr. LEXIS 6 at 12 (2009), *aff'd Diamond Sawblades Mfrs. Coalition v. United

States,* 612 F.3d 1348 (Fed. Cir. 2010).  In *Diamond Sawblades*, the Commission rejected on

remand an "attenuated competition" argument noting that "there is significant overlap in the 10-

inch and 14-inch size range which, in 2005, accounted for 43.4 percent of U.S. producers' U.S.

shipments by value and 44.4 percent of U.S. commercial shipments of cumulated subject imports

**PROPRIETARY INFORMATION DELETED**

by value."[8]  As noted above, domestic and subject imports of refrigerators overlap across at least

[     ] percent of the total market.  **Confidential Exhibit 2.**

> 4.  *The Commission's Segmentation of the Market By Reference to 27.5 Cubic Feet Capacity Was Arbitrary, and Its Finding that Competition Between "Jumbo" Imports and Domestic Refrigerators Was "Attenuated" Is Unsupported by Substantial Evidence*

Beyond the double counting error and its error regarding the overlap in competition in

four door models, the Commission's "attenuated competition" finding was also based on an

unreasonable and unsupported assumption that so-called "jumbo" refrigerators did not compete

with smaller capacity refrigerators.  In essence, the Commission concluded that Whirlpool's 27.0

and 27.4 cubic foot capacity refrigerators[9] did not compete with the Samsung or LG "jumbo"

models that had only 0.6 to 2.0 more cubic feet in capacity.  The record of the Commission's

investigation contains zero support for this proposition.

First, there is no record evidence that 27.5 cubic feet is a meaningful dividing line

between different refrigerator models.  C.R. 180 at 7; P.R. 213 at 6.  In fact, having rejected

arguments that the market should be segmented at 25.5 cubic feet or 27.0 cubic feet, the

Commission in the final determination arbitrarily added 0.5 cubic feet to create a new definition

of "jumbo" capacity at 27.5 cubic feet.  *Compare* P.R. 71 at 5[10] and 20-21, *with* P.R. 213 at 6.

The Commission cited two sources for the "jumbo" segment that it defined, *i.e.*, the staff report

---

[8] *Diamond Sawblades and Parts Thereof from Korea and China*, Inv. No. 731-TA-1092 and 1093 (Final) (Remand), USITC Pub. No. 4007 at 10-11 (May 2008).

[9] *E.g.,* P.R. 213 at 28, n.203 (citing P.R. 185 at 292 for the fact that Whirlpool produced a 27.4 cubic foot model).

[10] "In terms of capacity, bottom mount refrigerators may be characterized as 'large' or 'jumbo' capacity, with an interior measuring 27 cubic feet or more...."  P.R. 71 at 5.

and the testimony of Whirlpool's Marc Bitzer. P.R. 213 at 6, n.19. However, neither source identified any refrigerator as "jumbo," much less drew a line at 27.5 cubic feet of capacity.

In its discussion of capacity generally, the staff report referenced LG and Samsung "larger" capacity refrigerators at 28 and 29 cubic feet, as contrasted to LG and Samsung's 26.5 cubic foot refrigerators. P.R. 213 at I-12-13. The staff report also noted that Whirlpool had a "vacuum panel, 27.4 bottom model in the market." P.R. 213 at I-13. But there is no reference to a category of "jumbo" refrigerators and the figure 27.5 does not appear anywhere in the staff's discussion or in the testimony by Mr. Bitzer referred to by the Commission. P.R. 185 at 292.[11] In short, the 27.5 cubic foot dividing line to define "jumbo" refrigerators was developed by the Commission out of whole cloth, and was unsupported by substantial evidence.

Second, the Commission's preliminary determination underscores the analysis that "jumbo" models of 27.5 cubic feet and above *do* in fact compete with smaller capacity models. In its preliminary determination, the Commission first defined "jumbo" refrigerators as 27.0 cubic feet and above, not 27.5. P.R. 71 at 5. It then expressly concluded that "Whirlpool's 27 cubic foot bottom mount refrigerator model *competes with* LG's 28 cubic foot model and Samsung's 29 cubic foot model in the 'big capacity' segment." P.R. 71 at 21, n.139 (emphasis added).[12] In the final phase of the investigation, the record shows that refrigerators with an

---

[11] The only reference to 27.5 cubic feet in fact seems to be the Traqline data used to estimate the size of the so-called "jumbo" market. However, Traqline created 10 different capacity ranges, starting at 6.5-13.4 cubic feet and increasing in increments of 1.9 cubic feet through the last category, "29.5 cubic feet or more." P.R. 120 at 4. There is no reference to "jumbo" and no basis to define that category at 27.5 versus 29.5 or any other dividing line arbitrarily used by Traqline.

[12] This conclusion was supported by testimony that "Whirlpool's 27 cubic foot bottom mount refrigerator competes with LG's 28 cubic foot model and Samsung's 29 cubic foot model ...." P.R. 71 at 21, n.139.

**PROPRIETARY INFORMATION DELETED**

internal capacity equal to or greater than 27.5 cubic feet and refrigerators with less internal capacity were both sold to the same set of retailers, displayed on the same set of retailers' floors and were designed to fit into the same kitchen spaces.  P.R. 213 at 9,16, I-13; *see also* C.R. 176 at 10; P.R. 176 at 10.  On this record, *there was no rational basis to add 0.5 cubic feet to the dividing line, and then declare that the "jumbo" subject import models no longer compete with the 27.4 cubic foot domestic model.*

Third, the Commission's capacity-based distinction between "jumbo" and "regular" refrigerators is impossible to reconcile with its treatment of other differences in internal capacity.  For example, in its competitive pricing analyses, the Commission considered that the capacity differences between a 24.5 cubic foot refrigerator and a 26.4 cubic foot refrigerator (Product 6A), and a 22.5 cubic foot refrigerator and a 24.4 cubic foot refrigerator (Product 7A), were immaterial.  P.R. 213 at V-10.

Finally, as the Commission states, the data show a trend toward larger refrigerators.  P.R. 213 at 22-23.  That trend is, however, evidence of competition between the larger and smaller models, not of a lack of competition.  Because the refrigerator market is largely a replacement market,[13] a rise in sales of one type of refrigerator model is necessarily at the expense of other types.  If there were no meaningful overlap of competition between jumbo and smaller capacity refrigerators, there would never be a shift from one type to the other.  Thus, contrary to the Commission's implicit assumption of essentially no competition between "jumbo" and smaller

---

[13] P.R. 213 at II-9.

**PROPRIETARY INFORMATION DELETED**

capacity refrigerators, the "trend toward" jumbo refrigerators is evidence of competition between them on a value (that is, features for the price) basis.[14]

### C.    The Commission's Conclusions Regarding the Price Effects of Subject Imports on the Domestic Industry are Wrong as a Matter of Fact and Law

#### 1.    *The Commission's Underselling Analysis Was Badly Flawed*

##### a.    *The Commission's Finding of No Significant Price Underselling by Subject Imports Is Contradicted by the Data*

The Commission found no "significant" underselling by subject imports in the pricing data it collected, concluding that "subject imports oversold the domestic like product in [      ] of [      ] possible quarterly comparisons or [      ] percent of the time at margins that range from [      ] to [      ] percent." C.R. 180 at 52; P.R. 213 at 34-35.  However, the Commission's characterization of the data by reference to a perfunctory aggregate calculation of quarters of overselling and underselling distorts the record evidence.[15]

The Commission had before it quarterly comparisons for four pricing products, *i.e.*, Product 1A, Product 2A, Product 4A and Product 6A.  For Product 1A, subject imports from [      ] undersold the domestic product [                                    ] for which data were

---

[14] Notably, the Commission's staff estimated an  elasticity of substitution range from "2 to 5" — or, "moderate to high" — between subject imports and the domestic like product, C.R. 169 at II-37, P.R. 213 at II-21, and the Commission itself found a "moderate" elasticity of substitution. C.R. 180 at 35; P.R. 213 at 23-24.  It is difficult to reconcile a finding of "attenuated competition" with even a "moderate" elasticity of substitution between subject imports and the domestic like product.

[15] The relevant pricing data are set out in **Confidential Exhibit 3.**

PROPRIETARY INFORMATION DELETED

available. C.R. 179 at V-58.[16]  The incidence of underselling for Product 2A imports from

[        ] was [            ] possible comparisons, and for Product 4A, subject imports from

[        ] undersold the domestic like product in [            ] possible quarterly

comparisons. C.R. 169 at V-60, V-64.  Taken together, the incidence of underselling by subject

imports for these three products was [                                        ].

Moreover, for each of these products, the data also show [

], as detailed below in

connection with the "price depression/suppression" discussion.

The data for Product 6A, by contrast, show [

]. C.R.

179 at V-68.  However, the feature parameters for Product 6A were considerably looser than for

Products 1A, 2A and 4A.[17]  Accordingly, the Product 6A pricing data collected by the

Commission are subject to distortion due to feature differences in a way that the data for

Products 1A, 2A and 4A are not.  In other words, the record shows a [            ] of

---

[16] The referenced pricing comparisons involve domestic and subject import prices for all models within a given product definition, net of direct and indirect discounts. *See* C.R. 169 at V-27; P.R. 213 at 33.  It may be noted, however, that because of the problems with LG's pricing data, a better comparison in the case of LG would only use prices net of direct discounts. *See* P.R. 213 at 33; C.R. 166 at 4-5; C.R. 176 at 8.

[17] As noted above, Product 6A refrigerators had a capacity band of 1.9 cubic feet (between 24.5 and 26.4 cubic feet); the capacity band for Products 1A, 2A and 4A was only 0.9 cubic feet. C.R. 169 at V-18; P.R. 213 at V-10.  Notably, the capacity difference within Product 6A was two to three times more than the difference between Whirlpool's 27.0 and 27.4 cubic foot refrigerators, and so-called "jumbo" refrigerators at 28 cubic feet.  Furthermore, Product 6A did not distinguish between enhanced dual evaporator models with "twin cooling" functionality and more basic single evaporator models. *Id.*

**PROPRIETARY INFORMATION DELETED**

underselling for categories where the imports and the domestic like product are most

comparable.  The Commission simply never addressed the impact of feature differences on the

Product 6A data.  Rather, it essentially determined without supporting evidence that they were

inconsequential.  C.R. 180 at 47-48; P.R. 213 at 32.

> b.    *As a Matter of Law, the Commission Impermissibly Ignored*
>        *Feature Differences in its Underselling Analysis*

The Commission recognized that there is a correlation between the feature load of

different refrigerators and their perceived value in the market.  C.R. 180 at 44; P.R. 213 at 29-30.

At the same time, the Commission refused Whirlpool's request to take account of feature

differences in its pricing analysis:

> Petitioner also argues that the Commission should take relative
> 'feature loads' of competing domestically produced and subject
> imported models into account in its price comparisons, on the
> theory that subject import price adversely impact domestic prices
> when a competing subject imported models' superior feature load
> is not fully reflected in the model's price …
>
> We find petitioners' proposed analysis unnecessary and
> unworkable.  It is unnecessary because our pricing data were
> collected on the basis of pricing products defined to include
> specific features, and thus permit probative price comparisons
> between domestically produced and subject imported models
> possessing similar features. ….

C.R. 180 at 46-47; P.R. 213 at 31-32.

By doing so, the Commission dismissed the relevance of *Maine Potato Council v. United*

*States*, 9 CIT 460, 617 F. Supp. 1088, 1089 (1985), in which this Court held "where the

**PROPRIETARY INFORMATION DELETED**

Commission finds quality differences significant, it must account for such differences in its

analysis,"[18] stating that:

> Although we have found evidence that subject imports are superior
> in terms of innovation and design, we do not agree that *Maine
> Potato* is relevant to our analysis ... {because} the record indicates
> that there was no consistent premium commanded by subject
> imports, with wide variations in margins of overselling and some
> underselling as well.

C.R. 180 at 47, n. 225; P.R. 213 at 32, n. 225.

The Commission's conclusory statement misses the point entirely, while demonstrating

that it *did not* account for the differences. If, the subject imports were "superior in terms of

innovation and design," one would expect a price premium relative to the comparable domestic

products. Given that the subject imports were sold at less than fair value, *the absence of a*

*consistent price premium indicates that subject imports were in fact exerting downward pressure*

*prices of domestic products which the Commission believed were inferior in terms of innovation*

*and design.* Having concluded that products with a higher feature load offered higher value, the

Commission could not lawfully disregard the impact of feature differences on the pricing data,

even if it could not assign specific values to specific features. *See, R-M Industries v. United*

*States,* 18 CIT 219, 227, 848 F. Supp. 204, 211 (1994).

Absent the ability to adjust its pricing data for "specific feature differences," the

Commission should have deemphasized the aggregate underselling data in its analysis and

---

[18] In its previous decision in *Maine Potato Council v. United States*, 9 CIT 293, 297, 613 F.
Supp. 1237, 1239 (1985), the Court of International Trade defined quality factors in a broad
sense to include appearance and size of the product, in the following terms: "Prince Edward
Island potatoes are considered more appealing in appearance because they are grown in a reddish
soil, and both Prince Edward Island and New Brunswick potatoes are preferred due to more
uniform Canadian size requirements. Differences in Canadian and U.S. marketing also
contributed to the competitiveness of Canadian potatoes." In a footnote, the court added that it
"will refer to these particular nonprice factors as quality factors in subsequent discussions."

**PROPRIETARY INFORMATION DELETED**

focused instead on price depression and price suppression in the product pricing comparisons where the most significant feature differences did not exist.  By choosing to do the opposite, that is, by focusing simply on a mechanical "head-count" of the instances of underselling, the Commission both failed to consider price depression and price suppression apart from price underselling, and allowed the shortcomings of its underselling analysis to infect its assessment of price depression and price suppression.

>    c.    *The Commission Improperly Refused to Consider LG's Pricing*
>          *Data Separately from Samsung's*

Another problem with the Commission's price underselling analysis is its refusal to examine the Samsung and LG data separately, rather than only in the aggregate.  The record shows that both companies were major exporters of subject refrigerators to the U.S. market.  *See, e.g.,* C.R. 169 at IV-10.  The evidence also shows that LG's and Whirlpool's product lines were more similar to each other's than to Samsung's because [

].  *E.g.,* C.R. 169 at I-16-17.

In addition, the Commission had before it evidence showing that [


].  *See* C.R. 150 at Exhibit G.

For all these reasons, Whirlpool asked the Commission to consider "price leadership" by one or the other Korean producer.  C.R. 150 at 8-10.  To this end, it provided data showing LG [                                    ] Samsung, had the [

] for which the Commission collected pricing data.  C.R. 150 at Exhibit G.  Put another way, the record showed that [

].

**PROPRIETARY INFORMATION DELETED**

Whirlpool also submitted evidence showing that Commerce found that many of LG's discount and rebate programs were misallocated and its net prices reflected a failure to accurately account for discounts and rebates on a customer-, time- and/or SKU-specific basis, as applicable. C.R. 134 at 9, n.12; P.R. 125 at 9, n. 12; *see also* C.R. 150 at 7 and Exh. E; P.R. 146 at 7 and Exh. E.  In its final determination, Commerce found that LG's reported rebates were "distortive" and unreasonable.  C.R. 150 at 7; P.R. 146 at 7.

The Commission agreed with Whirlpool that the LG pricing and discount data were "potentially problematic," but, even so, refused to consider the disaggregated data Whirlpool had put on the record, asserting that (1) "{p}etitioner fails to provide sufficient reason for us to diverge from our normal practice here," (2) "inclusion or exclusion of LG's pricing data makes no difference to our analysis," and (3) drawing "adverse inferences against LG ... would penalize Samsung."  C.R. 180 at 46, 51 and n.246; P.R. 213 at 31, 34 and n.246.  None of these rationales justifies the Commission's approach of using the aggregate of the LG and Samsung pricing data without any adjustment to the LG data.

On the first point, the Commission cited as the basis for not "diverg{ing} from our normal practice" four prior determinations and one court decision.  However, none of the cited authorities supports the Commission's ignoring company-specific pricing data when the disaggregated data contradict the Commission's aggregated price underselling analysis.  C.R. 180 at 46; P.R. 213 at 31.

The Commission's second rationale — that the aggregation of the LG pricing data "makes no difference to our analysis" — was based upon a misapprehension of what it would mean to analyze the LG and Samsung data separately.  Thus, in justifying its approach, the Commission stated that "{w}e reach the same conclusion when LG's data are *excluded* from our

**PROPRIETARY INFORMATION DELETED**

analysis," and then proceeded to analyze the pricing data "excluding LG." C.R. 180 at 52; P.R.

213 at 35 (emphasis added). However, the essential point was that there should be a separate

comparison of LG prices and domestic prices, particularly given the evidence noted above

relating to the greater similarity between the Whirlpool and the LG product lines compared to the

Samsung product lines. "Excluding LG" from the analysis did not respond to the essential point

and thus did not provide a reasonable basis for the Commission to assess the merits of

Whirlpool's "price leadership" argument.

Third, it was plainly inappropriate for the Commission to accept the "potentially

problematic" and "less probative" LG data as submitted on the ground that an adverse inference

drawn from LG's failure to provide accurate data "would penalize Samsung." C.R. 180 at 51,

n.246; P.R. 213 at 34, n. 46. There is no conceivable justification for accepting potentially

inaccurate data from one of two major respondents, especially where its [

         ], because to do otherwise would be adverse to *another respondent's* interests. Yet

that is precisely what the Commission did.

The Commission's fundamental concern should have been to arrive at the most accurate

determination whether subject imports from either of the two major sources of subject import

supply undersold domestic producer prices. *Nucor Fastener Div. v. United States*, 791 F. Supp.

2d 1269, 1284-85 (Ct. Int'l Trade 2011). By limiting its own options to either considering the

aggregate data or excluding LG's data, the Commission failed "to consider an important aspect

of the problem." *Id.* at 1285 (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.

Co.*, 463 U.S. 29, 43 (1983)).

This situation should be distinguished from the "adverse inference" logic often applied to

companies that fail to cooperate. The Commission "rarely draws adverse inferences because its

PROPRIETARY INFORMATION DELETED

decisions affect all industry participants," not only the non-cooperative companies. *GEO Specialty Chems. Inc. v. United States*, Slip Op. 09-13, 2009 Ct. Intl. Tr. LEXIS 12 at *28 (2009). Here, though, simply to disaggregate the company-specific data submitted by respondents would not have entailed an adverse inference. Rather, the methodology proposed by Whirlpool was a reasonable means to assess the extent of the underselling *by reference to both Samsung's and LG's own data.*

In addition, fairness to *all* parties, including the domestic industry, required analysis of Samsung's and LG's data on a disaggregated basis. To paraphrase *International Union*, "{w}here, as here, {the Commission's} refusal to consider the evidentiary inference flowing from the company's {non-cooperation} has the effect of denying a fair hearing to one of the parties, the argument for judicial intervention becomes overpowering." *International Union v. NLRB*, 459 F.2d 1329, 1341 (D.C. Cir. 1972).

> 2.  *The Commission Misapplied the Statute in its Analysis of Price Depression and Price Suppression and Reached Findings Regarding Both that Are Unsupported by Substantial Evidence.*
>
> > a.  *The Commission Ignored Evidence of the Clear Correlation Between Price [*
> >
> > *]*

The Commission dismissed Whirlpool's price depression claim in the face of uncontested evidence that domestic prices were, in fact, declining. Specifically, the Commission stated that although it found that "reported prices net of direct and indirect discounts on domestically produced Products 1A-6A and 1B-6B declined between the first and last quarters for which data are available, by between [     ] to [     ] percent," it "could not conclude that subject import price competition contributed significantly to this trend, however, due to the absence of any clear

**PROPRIETARY INFORMATION DELETED**

correlation between subject import underselling and domestic prices." P.R. 213 at 35; C.R. 180 at 53.

The Commission elaborated on the relevance of its underselling analysis to its price depression analysis by noting that:

> domestic prices declined by a greater percentage with respect to domestically produced products 4A, 4B, 6A and 6B which were generally oversold than for products 1A and 1B which were generally undersold.

P.R. 213 at 35; C.R. 180 at 53.

As a threshold matter, the plain language of Section 771(7)(C) of the Act, 19 U.S.C. § 1677(7)(C)(ii), instructs the Commission to consider whether there is underselling and "otherwise" to consider whether there is price depression or suppression as a result of the unfairly traded imports. *See, e.g., R-M Industries,* 18 CIT at 227, 848 F. Supp. at 211. Case law further teaches that price depression and suppression can occur in the absence of predominant underselling. "{T}his court has previously affirmed a finding of price suppression in tandem with a finding of mixed overselling and underselling." *Shandong TTCA,* 774 F. Supp. 2d at 1332 (2011) (*citing Companhia Paulista de Ferro-Ligas v. United States,* 21 CIT 473, 478 (1996)). In *Shangdong TTCA,* as here, "about a dozen sophisticated and powerful firms account{ed} for a substantial portion of total purchases." *Id.*[19] In such circumstances, the court reasoned that subject imports would affect domestic producers' prices even if evidence of underselling was mixed. *Id.* "With a few major purchasers dominating the U.S. market and buying large volumes of both subject imports and domestic merchandise, and the observed razor thin differences in

---

[19] Here, in fact, the Commission identified only seven major customers, including Best Buy, Home Depot, Lowe's, Sears and three others. C.R. 180 at 22; P.R. 213 at 15.

**PROPRIETARY INFORMATION DELETED**

prices, it is hard to imagine a scenario in which prices for domestic merchandise and subject imports could be completely de-linked.").

Here, likewise, given the (at least) [      ] record of underselling and overselling to a handful of major customers,[20] and given that the only major sources of supply were subject imports and the domestic like product — "it is hard to imagine a scenario" in which import prices did not impact U.S. producer prices. 774 F. Supp. 2d at 1332. Nevertheless, the Commission (incorrectly for the reasons detailed above) found no significant price underselling, and then relied upon that finding in concluding that subject imports did not depress or suppress prices of the domestic like product. *E.g.,* C.R. 180 at 55, 63-65; P.R. 213 at 36, 40-41.

However, apart from this error, the Commission's focus on the general incidence of price underselling and overselling for Products 1A, 2A, 4A and 6A misses clear correlations between price underselling by subject imports and declines in U.S. producer prices for [       ] products. Thus, had the Commission accurately correlated the decline in domestic prices for Product 1A with subject import prices for Product 1A, it would have found that (1) from the first quarter of 2009 through the third quarter of 2010, the subject imports [               ], and (2) the price of the domestic product [                ] to [         ], a [            ] or [        ] percent, over that period. C.R. 179 at V-58. By contrast, from the fourth quarter of 2010 through year end 2011, when subject imports oversold the domestic product [                           ], domestic prices [                ] to [         ] or by [        ] percent. C.R. 179 at V-58. These data have been reproduced at **Confidential Exhibit 3**.

---

[20] C.R. 179 at V-88 (Table V-35) and V-89 (Table V-36).

PROPRIETARY INFORMATION DELETED

The data for Product 4A tell a similar story. C.R. 169 at V-64. The first domestic and import sales of Product 4A occurred [                              ]. The average price of the domestic product in this quarter was [              ]. The average price of the imported product during this quarter was at [                              ]. The Product 4A subject imports [              ] the domestic prices through the second quarter of 2010. During that period, the price of the domestic like product [                  ] or by [              ]. For the remainder of the period of investigation, when subject imports [

                              ] pronounced. *See* **Confidential Exhibit 3**.

The data for Product 2A, which are also included in **Confidential Exhibit 3** and which the Commission only addresses in a footnote, also show [

                              ]. C.R. 169 at V-60. The Commission's footnote dismisses the relationship between underselling by subject imports and the decline in domestic prices for Product 2A as aberrational and of minor consequence. Clearly, however, the Product 2A data are *not* aberrational.

To the contrary, [



                              ]. C.R. 179 at V-69. However, Product 6A is, as detailed above, defined more loosely than Products 1A, 2A and 4A in terms of the range in capacity allowed for the models that are compared and the inclusion of both enhanced dual evaporator models and more basic single evaporator models in the same dataset. C.R. 169 at V-9-10; P.R. 213 at V-9-10. The Product 6A pricing data are, therefore, more distorted by product mix (*i.e.*, capacity and feature differences), and thus cannot reasonably be relied upon as [

**PROPRIETARY INFORMATION DELETED**

] for the conclusion that underselling by subject imports was not responsible for the manifest declines in domestic producer prices. *See Nevinnomysskiy Azot v. United States,* 32 CIT 642, 655, 565 F. Supp. 2d 1357, 1369 (2008) ("the Commission has stated that 'it views {average unit values} with caution when comparing prices of the domestic like product and subject imports' because 'the product mix in the two groups may differ'…."). In short, the record evidence does not support the Commission's finding of an "absence of any clear correlation between subject import underselling and domestic prices." P.R. 213 at 35; C.R. 180 at 53.

> b.   *The Commission Improperly Ignored Explicit Testimony by Samsung's Witness that the Pricing of Samsung's Product 6A Forced Whirlpool to Discount its Own Product 6A Prices*

While the probative value of Product 6A pricing data is compromised by product feature differences, the evidence of the price depressing and suppressing effect of Product 6A imports on domestic producer prices was addressed directly at the hearing by Mr. Kevin Dexter, Samsung America's Senior Vice President for Home Appliances. Speaking about a Samsung and a Whirlpool refrigerator that he had brought to the Commission hearing floor, Mr. Dexter said: "To compete against our {Samsung's} model, Whirlpool has had to promote very frequently and offer deep discounts which it does." P.R. 185 at 153.

Although asserting that Samsung's model was "superior," the point made, and echoed by the testimony of witnesses for LG and The Home Depot (P.R. 185 at 200-201), is that the prices of the allegedly "superior" subject imports forced Whirlpool to reduce the prices of its most comparable models. Mr. Dexter's testimony is proof that as a matter of economic fact, price depression occurs without regard to underselling when the low price of a "higher value" product forces a drop in the price of a competing "lower value" product.

**PROPRIETARY INFORMATION DELETED**

   *c.*  *The Commission's Efforts to Explain the Fall in Domestic*
      *Producer Prices over the Period of Investigation by Reference to*
      *(1) Market Segmentation, (2) the Absence of Price Underselling,*
      *and (3) the Life Cycle of Bottom Mount Refrigerators Fail on the*
      *Law and the Record Evidence*

   The Commission's effort to explain the conclusion that the decline in Whirlpool's prices

was substantially unrelated to competition with the only other source of significant supply to the

U.S. market ultimately boils down to three wholly unsupported assertions of fact reflected in the

following:

> {1} Although Whirlpool claims that it deliberately cut prices in
> 2011 to stanch its loss of market share to subject imports, we note
> that much of the gain in subject import market share occurred in
> the jumbo segment of the bottom mount refrigerator market, which
> Whirlpool did not serve. {2} Moreover, Whirlpool would not have
> cut its prices in order to meet prices because subject import prices
> were generally higher in 2010 and 2011.
>
> {3} Finally, the record indicates that the price of every bottom
> mount refrigerator declines over the course of the model's life
> cycle, which can range from two to six years.

C.R. 180 at 53-54; P.R. 213 at 36 (material in brackets added).

   The Commission's mistake of arithmetic undermines the first sentence above. As

detailed above, the rise of subject "jumbo" imports with an internal capacity equal to or greater

than 27.5 cubic feet simply was not as significant as the Commission thought. *See* **Confidential**

**Exhibit 1**. Moreover, there is no evidence in the record to support a finding that Whirlpool's

27.4 cubic foot model or, for that matter, its other models, did not compete with, and were not

affected by, the sales and prices of Samsung's and/or LG's so-called "jumbo" models. *See*

Section III(B)(4), *supra*.

   The second prong of the Commission's rationale is nothing more than a restatement of its

legally impermissible and factually untenable insistence that price depression "by reason of"

subject imports cannot occur without underselling. To repeat,

(1) Section 771(7)(C)(ii)(II) of the Act instructs the Commission to consider whether there is "significant" underselling and whether the effect of the pricing of subject imports *otherwise* is to depress or suppress prices to a significant degree,

(2) the Commission fails to address why, except for competitive pressure from the only other source of high volume supply (*i.e.*, subject imports), a publicly-traded, profit-maximizing domestic producer such as Whirlpool would ever lower its prices to below-cost levels during a period of growing demand,

(3) the pricing data do, in fact, show a clear pattern of U.S. producer prices [                              ] by subject imports for three of the four pricing product categories, and

(4) Samsung's own witness stated unequivocally that for the other pricing product category, Product 6A, Whirlpool had to discount its prices to compete with the higher value associated with subject imports.

The final part of the Commission's explanation for the fall in U.S. producer prices is the "life cycle" of bottom mount refrigerators. C.R. 180 at 54; P.R. 213 at 36. The Commission found that the *minimum* life cycle of a refrigerator model is at least "two to three years" and the maximum is five or six years. C.R. 180 at 23; C.R. 169 at V-13-14; P.R. 213 at 16 and V-7-8. Yet, the prices for Products 2A and 4A [

]. C.R. 169 at V-60, V-64. *See*

**Confidential Exhibit 3.** Such declines cannot be reasonably attributed to a minimum two-to-three year "life cycle," much less a five or six year one.

Specifically, Whirlpool launched its Product 2A four door refrigerator in the third quarter of 2010 at [          ]. C.R. 169 at V-60. By the third quarter of 2011, *i.e.*, during its first year

PROPRIETARY INFORMATION DELETED

in the market, its Product 2A price had [                                    ].  Over this

same period, subject imports [                ] this product in [                    ] by margins ranging

from [        ] percent to [        ] percent.  *Id.*  Similarly, Whirlpool's Product 4A model was

introduced in the second quarter of 2009.  C.R. 169 at V-64.  By the first quarter of 2010, *i.e.*,

less than a year after introduction, its price had dropped from [            ] to [            ], or

[                ] percent, during a period when subject imports [                ] domestic prices in

[                ] by margins ranging up to [        ] percent.  *Id.*  In other words, the record shows

significant price declines of domestic models less than a year after introduction.[21]

More generally, Whirlpool's product line, like those of other producers, evolves as old

models are refreshed and replaced by new models.  The "A" series of data collected by the

Commission are a mix of sales of new and older models.  C.R. 169 at V-18-19; P.R. 213 at V-9-

10.  In any given quarter, there may be volumes of both "close out" and "newer" products.

Because the Commission calculated average quarterly prices on the basis of aggregate quantity

and value data for the newer and older models in each product category, there is zero evidence to

support the Commission's hypothesis that the price declines evident for the pricing data reflect

the impact of sales of end-of-life Whirlpool models — and the Commission points to none.

---

[21] The data for these products are also included in **Confidential Exhibit 3.**

**PROPRIETARY INFORMATION DELETED**

> d. *The Commission's Price Suppression Analysis Is Also Wrong on Both the Law and the Facts*

The Commission recognized that economics of Whirlpool's bottom mount refrigerator business were compromised by a cost/price squeeze but "could not" conclude that subject imports "contributed significantly" to the problem:

> The record indicates that the domestic industry experienced a cost-price squeeze during the period examined, and particularly between 2010 and 2011 ... We cannot conclude that subject imports contributed significantly to the domestic industry's inability to raise its prices to cover cost increases for two reasons. First, the domestic industry's cost-price squeeze does not correspond to increases in subject import market share or a substantial amount of underselling, and there is no indication in the pricing data that subject imports placed a ceiling on domestic prices ...
>
> Second, explaining why the domestic industry was unable to pass on cost increases in higher prices ... is complicated by the nature of the bottom mount refrigerator market. As detailed in sections V.C and D above, the bottom mount refrigerator market is characterized by an evolving array of models, many featuring new and attractive features, and aggressive price discounting calculated to stimulate sales. Consumers make purchasing decisions based on differing and subjective evaluations of the value of competing bottom mount refrigerator models. In that light, we find that the dynamics of the bottom mount refrigerator market are too complex and there are too many factors influencing the data for us to conclude on this record that subject imports prevented domestic producers from achieving price increases that otherwise would have occurred to a significant degree.

P.R. 213 at 36-37; C.R. 180 at 54-55.

In this passage, the Commission explicitly recognized that the perceived value of a bottom mount refrigerator is based on its features and price, that "consumers make purchasing decisions based on differing and subjective evaluations of the value of competing bottom mount refrigerator models" and that producers, and the retailers to whom they sell, engage in "aggressive price discounting to stimulate sales." C.R. 180 at 55; P.R. 213 at 37. On these facts,

PROPRIETARY INFORMATION DELETED

it is irrational to conclude that "aggressive price discounting to stimulate sales" by subject imports with their self-proclaimed "superior" value (to say nothing of enhanced feature load) did not limit Whirlpool's ability to raise its own prices.[22]  It is simply inconceivable that Whirlpool would not have increased its prices in order to recover its increased costs over the period were it not constrained by competition from the only other source of high volume supply in the market place, that is, subject imports.

There are three other critical errors in the Commission's price suppression analysis. First, by stating that "the domestic industry's cost-price squeeze does not correspond to increases in subject import market share," the Commission also disregarded Whirlpool's testimony that it could not raise its own prices in 2011 despite rising costs, precisely because it had lost so much market share from 2009 to 2010.  C.R. 180 at 54-56; P.R. 213 at 36-37.  Far from contradicting Whirlpool's point, the fact that Whirlpool's market share losses abated in 2011 after it cut its own prices to better compete with subject imports corroborates that its prices were, in fact, suppressed by reason of the subject imports.

Second, the Commission's reliance on price underselling as the test for price suppression is no more lawful in a "price suppression" context than it was in a "price depression" context. *See* Section III(C)(1).

Third, the Commission's assertion that "there is no indication in the pricing data that subject imports placed a ceiling on domestic prices"[23] ignores (1) the coincident declines in the

---

[22]  Whirlpool offered the Commission further confirmation on this point in the form of its own 2012 data which showed that, *after Commerce's preliminary determination*, it was able to increase prices and thereby greatly improve its bottom line operating results.  C.R. 150 at 2-3; C.R. 176 at 4.  *See* 19 U.S.C. § 1677(7)(I) (instructing the Commission to consider whether the filing of the petition led to an improvement in the performance of the industry).

[23]  C.R. 180 at 55; P.R. 213 at 36.

**PROPRIETARY INFORMATION DELETED**

prices of both subject imports and the domestic like product for three of the four product

categories as detailed above, and (2) the sworn testimony of Samsung's Mr. Dexter who said

unequivocally that Whirlpool could not raise, and in fact had to lower, its prices precisely

because of competition from Samsung with respect to the fourth product category.  P.R. 185 at

155.

**D.     The Commission's Analysis of a Domestic Industry Lost Sale Is
Inconsistent with Section 771(7)(C)(iii)(V) of the Act and Is Otherwise
Unsupported by Substantial Evidence**

In its final determination, the Commission rejected Whirlpool's allegation that its loss to

[     ] of a major OEM sale was evidence of material injury by reason of subject imports.  The

Commission recognized that Whirlpool did, in fact, lose the sale to [       ], but concluded that the

sale was lost for "non-price" reasons:

> With respect to the portion of the contract that Whirlpool was
> invited to bid on, we find it significant that [
>
>
>                                                                      ].
>
> Whirlpool claims that [
>
>
>
>                              ].  Based on all the foregoing
> evidence, we find that price was not a significant factor in [
>                                              ].

C.R. 180 at 59-60; P.R. 213 at 38.

The Commission's analysis of Whirlpool's loss of the [                      ] both misapplies

the antidumping statute to evidence not in dispute and ignores evidence in the record that cannot

properly be ignored.

**PROPRIETARY INFORMATION DELETED**

The Commission found that [            ] and dumped price was not a "significant factor" [                                    ] because [

                                    ].  C.R. 180 at 59-60; P.R. 213 at 38-39.  In coming to that conclusion, however, the Commission failed to take in to account the fact that [      ] imports from Korea, including those to satisfy the [        ] bid, had been found to be dumped at a rate of [        ] percent.  In fact, it was only through a bid reflecting a dumped price that [      ] was able to offer a price that was sufficiently close to Whirlpool's bid to allow it to win the contract.[24]  Thus, but for the fact that [        ] prices were *unfairly traded*, the bid competition would not have been nearly as close.  In fact, *the only reason the Commission could find the price differential between the [            ] the Whirlpool was [                    ], was the fact that [        ] prices were based upon sales at less than fair value.*

The Commission, notwithstanding Section 771(7)(C)(iii)(V) of the Act, failed to analyze whether the effect of [        ] dumping was to narrow the pricing difference between the Whirlpool [        ] bids to [                        ].  As such, the Commission ignored its statutory obligation to assess the effect of [        ] dumping on a major sale that Whirlpool lost to subject imports.

The Commission's failure to address the effects of [                        ] is a particularly serious omission in light of the uncontested evidence that price was key to [        ] purchasing strategy.  There is no dispute that during the [                ] bidding process, [        ] pressed Whirlpool to lower its bid price.  C.R. 180 at 59.  Nor is there any question that

---

[24] Indeed, despite its references to [                ]

                        ].  C.R. 180 at 59-60; P.R. 213 at 38-39.

**PROPRIETARY INFORMATION DELETED**

[

].” C.R. 180 at 57.  Nevertheless, the Commission

dismissed the significance of price [                                    ] by stating that “this

strategy is not unique to [          ], but rather the strategy that any mass market appliance brand

owner would be expected to follow.”  C.R. 180 at 57; P.R. 213 at 37.

In other words, the Commission concluded that because *all* mass market appliance

retailers seek the best price for a bottom mount refrigerator with a particular set of features, *i.e.*,

because price is *always* an important factor in a retailer’s purchase decisions, it could reasonably

discount the significance of [        ]’s dumped price as a factor behind [          ] decision to award

its bottom mount business to [        ].  On this point, the Commission’s reasoning is untethered to

economic reality; *on the evidence*, there is no reasoned basis for the Commission to find that

[      ]’s offer to supply refrigerators at heavily dumped prices was not a material consideration

behind [          ] decision to award the contract to [      ].

> **E.**   **Upon Remanding the Commission’s Decision for Reconsideration of the Foregoing Issues, the Court Should Direct the Commission to Reconsider Its Determination Regarding the Impact of Subject Imports in Light of Any New or Different Findings**

The Commission found that the increase in subject import volume and market share was

“significant,” but concluded that the subject imports did not impact the domestic industry on the

basis of a miscalculation of the share of the market accounted for by four door and so-called

“jumbo” refrigerators.  P.R.  213 at 41.  The Commission similarly dismissed the impact of

subject imports on domestic prices, again citing “attenuated” competition as well as relying upon

a purely mechanical analysis of the underselling data, without regard for differences in [

].  Finally, the Commission conceded that the domestic industry was caught in a cost-price

**PROPRIETARY INFORMATION DELETED**

squeeze and suffered significant losses, but the Commission again attributed the industry's performance to anything other than subject imports: for example, the "life cycle." In each case, the Commission found that subject imports did not "impact" the domestic industry within the meaning of 19 U.S.C. § 1677(7)(C)(iii).

Therefore, in the event that this Court finds some or all of the subsidiary findings outlined above to be unsupported by substantial evidence or not in accordance with law, it should remand the determination for reconsideration of both the specific statutory factor (*e.g.*, whether the Commission correctly analyzed the significance of the increase in subject imports) and of the "impact" of subject imports with respect to that factor. Here, for example, the Commission "appears to have relied, at least in part, on the attenuated-competition finding for each of the above-referenced determinations." *Diamond Sawblades Mfrs. Coalition v. United States*, 32 CIT 134, 150 (2008). Thus, a remand order should instruct the Commission to reconsider each subsidiary finding, as well as the ultimate injury determination. *See also, e.g., United States Steel Group – A Unit of USX Corp. v. United States,* 18 CIT 1190, 1215, 873 F. Supp. 673, 696 (1994).

**PROPRIETARY INFORMATION DELETED**

## IV.  CONCLUSION

For the foregoing reasons, Whirlpool respectfully requests this Honorable Court to remand this action to the U.S. International Trade Commission, therein instructing the Commission to correct each of the errors of fact and law set forth above.

Respectfully submitted,

/s/ John D. Greenwald
John D. Greenwald
James R. Cannon Jr.
Jack A. Levy
Thomas M. Beline

Date:  January 22, 2013

**PROPRIETARY INFORMATION DELETED**

<u>Certificate of Compliance with Chambers Procedure 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 13,502 words, exclusive of the corporate disclosure statement, table of contents, table of authorities, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

BY:  <u>/s/ John D. Greenwald</u>
       John D. Greenwald

**PUBLIC EXHIBIT 1**

**PUBLIC VERSION**

|  | 2009 | 2010 | 2011 |  |  | Source notes |
|---|---|---|---|---|---|---|
| **1. "Jumbo" plus four door per the ITC methodology:** | | | | | | |
| Apparent Domestic Consumption (units) | [ | | | ] | (A) | C.R. 178, Table IV-7 |
| "Jumbo" share (per Traqline) | 0.149 | 0.178 | 0.224 | | (B) | P.R. 120 at 4 |
| Estimated "Jumbo" Consumption | [ | | | ] | (C) | = (A) * (B) |
| Product 2A | [ | | | ] | (D) | C.R. 169, Table V-22 |
| Product 3A | [ | | | ] | (E) | C.R. 169, Table V-24 |
| Estimated "Jumbo" plus four door per ITC | [ | | | ] | (F) | = (C) + (D) + (E) |
| Increase in "Jumbo" plus four door per ITC | [ | | | ] | (G) | =(F2011) - (F2009) |
| Increase in ADC (2009-2011) | [ | | | ] | (H) | = (A2011) - (A2009) |
| Increase in "Jumbo" plus four door as % of Increase in ADC | [ | | | ] | (I) | = (G) / (H) |
| **2. "Jumbo" plus four door corrected to eliminate double counting Product 3A:** | | | | | | |
| Apparent Domestic Consumption (units) | [ | | | ] | (A) | C.R. 178, Table IV-7 |
| "Jumbo" share (per Traqline) | 0.149 | 0.178 | 0.224 | | (B) | P.R. 120 at 4 |
| Estimated "Jumbo" Consumption | [ | | | ] | (C) | = (A) * (B) |
| Product 2A | [ | | | ] | (D) | C.R. 169, Table V-22 |
| Product 3A | [ | | | ] | (E) | Already counted as "Jumbo" |
| Estimated "Jumbo" plus four door per ITC | [ | | | ] | (F) | = (C) + (D) |
| Increase in "Jumbo" plus four door per ITC | [ | | | ] | (G) | =(F2011) - (F2009) |
| Increase in ADC (2009-2011) | [ | | | ] | (H) | = (A2011) - (A2009) |
| Increase in "Jumbo" plus four door as % of ADC | [ | | | ] | | = (G) / (H) |

PUBLIC VERSION

| | 2009 | 2010 | 2011 | | | Source notes |
|---|---|---|---|---|---|---|
| **3.  Increase in Subject Imports of "Jumbo" plus four door models, per the ITC methodology:** | | | | | | |
| Subject imports | [ | | | ] | (A) | C.R. 178, Table IV-7 |
| Estimated "Jumbo" Imports | [ | | | ] | (B) | ITC assumed all jumbo were imports |
| Imports of Product 2A | [ | | | ] | (C) | C.R. 169, Table V-22 |
| Imports of Product 3A | [ | | | ] | (D) | C.R. 169, Table V-24 |
| Subtotal Jumbo plus four door imports | [ | | | ] | (E) | = (B) + (C) + (D) |
| Increase in Jumbo plus four door imports | [ | | | ] | (F) | =(E2011) - (E2009) |
| Increase in Subject Imports | [ | | | ] | (G) | = (A2011) - (A2009) |
| Increase in "Jumbo" plus four door as % of increase in Subject Imports | [ | | | ] | (H) | = (F) / (G)* |
| **4.  Increase in Subject Imports of "Jumbo" plus four door models, corrected to eliminate double counting Product 3A** | | | | | | |
| Subject imports | [ | | | ] | (A) | C.R. 178, Table IV-7 |
| Estimated "Jumbo" Imports | [ | | | ] | (B) | ITC assumed all jumbo were imports |
| Imports of Product 2A | [ | | | ] | (C) | C.R. 169, Table V-22 |
| Imports of Product 3A | [ | | | ] | (D) | Already counted as "Jumbo" |
| Subtotal Jumbo plus four door imports | [ | | | ] | (E) | = (B) + (C) |
| Increase in Jumbo plus four door imports | [ | | | ] | (F) | =(E2011) - (E2009) |
| Increase in Subject Imports | [ | | | ] | (G) | = (A2011) - (A2009) |
| Increase in "Jumbo" plus four door as % of increase in Subject Imports | [ | | | ] | (H) | = (F) / (G) |

\* - The Commission calculated this figure as [          ] based upon two other mathematical errors.  Thus, the Commission explained the calculation as follows:

> Between 2009 and 2011, reported sales of subject imports satisfying the definitions of products 2 and 3, which are four-door models, increased [[          ]] units, CR/PR at Tables V-22, 24, while sales of jumbo bottom mount refrigerators increased by approximately [[          ]] units, see footnote 171, supra, for a total increase of [[          ]] units. Subject import U.S. shipments increased by [[          ]] units during the period. Memorandum INV-KK-046 (April 16, 2012) at Table IV-7.

C.R. 180 at 35, n.173.

First, the imports of products 2 and 3 increased [                              ].  Second, the Commission then divided [          ].

**PUBLIC EXHIBIT 2**

**PUBLIC VERSION**

|  | 2009 | 2010 | 2011 | Source notes |
|---|---|---|---|---|
| **1. Estimate of the portion of apparent domestic consumption in which subject imports and domestic products overlap:** | | | | |
| Apparent domestic consumption (units) | [ | | ] | (A) | C.R. 178, Table IV-7 |
| Estimated "jumbo" consumption (units) | [ | | ] | (B) | (P.R. 120 at 4) * ADC |
| Four door imports of Product 2A prior to domestic entry in 3Q2010 (units) | [ | | ] | (C) | C.R. 169, Table V-22 |
| ADC less "jumbo" and 4-door (prior to domestic entry in 3Q2010) (units) | [ | | ] | (D) | = (A) - (B) - (C) |
| ADC (less jumbo + 4-door) as % of Total ADC | [ | | ] | (E) | = (D) / (A) |
| **2. Subject imports share of the portion of ADC in which subject imports and domestic products overlap:** | | | | |
| Subject imports (units) | [ | | ] | (F) | C.R. 178, Table IV-7 |
| Estimated "jumbo" subject imports (units) | | | ] | (G) | ITC assumed all jumbo were imports |
| Four door imports of Product 2A prior to domestic entry (units) | [ | | ] | (H) | C.R. 169, Table V-22 |
| Subject Imports less "Jumbo" and four door pre-domestic-entry (units) | [ | | ] | (I) | = (F) - (G) - (H) |
| Subject Imports (less Jumbo + 4-door) as % of ADC  (less Jumbo + 4-door) | [ | | ] | (J) | = (I) / (D) |
| **3. Domestic producers share of the portion of ADC in which subject imports and domestic products overlap:** | | | | |
| U.S. Producer Shipments (units) | [ | | ] | (K) | C.R. 178, Table IV-7 |
| U.S. Producer Shipments as a share of ADC less "Jumbo" and four door pre-domestic-entry | [ | | ] | (L) | = (K) / (D) |

**PUBLIC EXHIBIT 3**

**Not susceptible to public summary (4 pages)**