Slip Op. 13- 155

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____     :
                                        :
WHIRLPOOL CORPORATION,                  :
                                        :
           Plaintiff,                   :
                                        :
                  v.                    :
                                        :
UNITED STATES,                          :     **PUBLIC VERSION**
                                        :     Before: Mark A. Barnett, Judge
           Defendant,                   :
                                        :     Court No. 12-00164
              and                       :
                                        :
SAMSUNG ELECTRONICS CO., LTD.,          :
and SAMSUNG ELECTRONICS                 :
AMERICA, INC.,                          :
                                        :
           Defendant-Intervenors,       :
                                        :
              and                       :
                                        :
LG ELECTRONICS, INC., and               :
LG ELECTRONICS USA, INC.,               :
                                        :
           Defendant-Intervenors.       :
_____     :


## OPINION

[The court grants in part and denies in part Plaintiff's motion for judgment on the agency record and remands to the International Trade Commission to further explain its analysis.]

Dated:   _December 26___, 2013

<u>James R. Cannon, Jr.</u>, and <u>John D. Greenwald</u>, Cassidy Levy Kent (USA), LLP, of Washington, DC, argued for plaintiff.  With them on the brief were <u>Jack A. Levy</u>, <u>Myles S. Getlan</u>, <u>Jennifer A. Hillman</u>, and <u>Thomas M. Beline.</u>

Karl S. von Schriltz, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for defendant.  With him on the brief were Paul R. Bardos, Acting General Counsel, and Neal J. Reynolds, Assistant General Counsel.

Christopher A. Dunn, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for Defendant-Intervenors LG Electronics, Inc. and LG Electronics USA, Inc.  With him on the brief were Neil R. Ellis, Lawrence R. Walders, Brenda A. Jacobs, and Dave M. Wharwood, Sidley Austin LLP, of Washington, DC.

Warren E. Connelly, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, argued for Defendant-Intervenors Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. With him on the brief was Jarrod M. Goldfeder.


Barnett, Judge:  Plaintiff Whirlpool Corporation ("Whirlpool") moves pursuant to USCIT Rule 56.2 for judgment on the agency record, challenging the United States International Trade Commission's ("ITC" or "Commission") negative final injury determination in antidumping and countervailing duty investigations concerning bottom mount combination refrigerator-freezers ("BMRs") from the Republic of Korea, published in *Bottom Mount Combination Refrigerator-Freezers from Korea and Mexico*, 77 Fed. Reg. 28,623 (ITC May 15, 2012 ("*Final Determination*"), and the accompanying memorandum *Bottom Mount Combination Refrigerator-Freezers from Korea and Mexico*, USITC Pub. 4318, Inv. Nos. 701-TA-477 and 731-TA-1180-1181 (Final) (May 2012) ("*Views of the Commission*" or "*Views*").[1]  For the reasons stated below, the court grants, in part, and denies, in part, Whirlpool's motion and remands the case to the ITC.

## Background and Procedural History

On March 30, 2011, Whirlpool filed a petition with the ITC, alleging material injury to domestic producers of BMRs due to dumped imports from Mexico and dumped and subsidized

---

[1] All citations to the *Views of the Commission* are to the confidential version of the document.

imports from Korea ("subject imports").  *Bottom Mount Combination Refrigerator-Freezers*

*from Korea and Mexico*, 76 Fed. Reg. 19,125 (ITC Apr. 6, 2011).  Following its preliminary

investigation, the ITC published a unanimous affirmative preliminary injury determination,

finding a reasonable indication of material injury to the domestic industry.  *Bottom Mount*

*Combination Refrigerator-Freezers from Korea and Mexico*, USITC Pub. 4232, Inv. Nos. 701-

TA-477 and 731-TA-1180-1181 (Preliminary) (May 2011).  In May 2012, the Commission

published its final determination.  In the decision, it described BMRs as follows:

> All bottom mount refrigerators are characterized by a lower freezer compartment
> and an upper refrigerator compartment . . . , although they otherwise come in a
> variety of configurations and capacities with different combinations of features.
> In terms of configuration, bottom mount refrigerators may be two-door, three-
> door French door, or four-door French door with an additional drawer between
> the freezer and refrigerator compartments. . . . Bottom mount refrigerators may be
> characterized as "large" or "jumbo" capacity, with an interior measuring 27.5
> cubic feet or more, or regular capacity, with an interior measuring 27.4 cubic feet
> or less.

*Views* at 6-7 (footnotes omitted).  Relying on this definition, the Commission unanimously found

that, during the period of investigation ("POI") between 2009 and 2011, cumulated imports of

dumped and subsidized BMRs from Korea and dumped BMRs from Mexico had neither caused

nor threatened to cause material injury to the domestic industry.[2]  *Final Determination*, 77 Fed.

Reg. at 28,623.

---

[2] Between the publication of the ITC's preliminary and final determinations, the
Commerce Department published final affirmative determinations of dumping and subsidization.
*Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical
Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from Mexico*,
77 Fed. Reg. 17,422 (Dep't of Commerce Mar. 26, 2012); *Notice of Final Determination of Sales
at Less Than Fair Value and Negative Critical Circumstances Determination: Bottom Mount
Combination Refrigerator-Freezers from the Republic of Korea*, 77 Fed. Reg. 17,413 (Dep't of
Commerce Mar. 26, 2012); *Bottom Mount Combination Refrigerator-Freezers from the Republic
of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,410 (Dep't of
Commerce Mar. 26, 2012).

Specifically, the Commission concluded that, despite a significant increase in subject import volume, subject imports did not displace a significant volume of domestic industry shipments from the U.S. market. *Views* at 41. In its examination of the price effects of subject imports, the Commission found a "moderate degree of substitutability" in demand between subject imports and the domestic like product, with "several factors that attenuated subject imports competition." *Id.* at 44. It also determined that "both price and non-price factors are important considerations [for consumers] in [BMR] purchasing decisions." *Id.* The ITC additionally observed that subject import price underselling "was not significant" and that subject imports did not significantly depress or suppress domestic like product prices. *Id.* at 52-54. Taking these findings in the aggregate, the ITC concluded that subject imports did not have a significant adverse impact on the domestic industry and, therefore, did not materially injure the domestic industry. *Id.* at 63-65. It similarly determined that subject imports do not threaten the domestic industry with material injury. *Id.* at 70.

Whirlpool now challenges the *Final Determination* on several grounds. (*See generally* Plaintiff's Memorandum in Support of Its Rule 56.2 Motion ("Pl.'s Mot.").) It contests as unsupported by substantial evidence or not in accordance with law the ITC's findings that (1) the volume of subject imports did not displace a significant volume of the domestic like product, (2) subject imports did not significantly undersell domestic producer prices, (3) competition from subject imports did not depress or suppress domestic producers' prices, and (4) price played a significant role in the domestic industry's loss of an [[

]]. (Pl.'s Mot. 1-5.) The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(c).

## STANDARD OF REVIEW

An ITC determination is "presumed to be correct," and the burden of proving otherwise

rests upon the challenging party.  28 U.S.C. § 2639(a)(1).  The court will uphold an agency

determination that is supported by substantial evidence and otherwise in accordance with law.

19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322

F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938)).  It requires "'more than a mere scintilla," but "'less than the weight of the evidence.'"

*Nucor Corp. v. United States*, 34 CIT __, __, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx,*

*Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).  In determining whether substantial

evidence supports the ITC's determination, the court must consider "the record as a whole,

including evidence that supports as well as evidence that 'fairly detracts from the substantiality

of the evidence.'"  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)

(quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The ITC need

not address every piece of evidence presented by the parties; absent a showing to the contrary,

the court presumes that the ITC has considered all of the record evidence.  *Aluminum Extrusions*

*Fair Trade Comm. v. United States*, 36 CIT __, __, 2012 WL 5201218, at *2 (2012) (citing

*USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)).  That a plaintiff can point to

evidence that detracts from the agency's conclusion or that there is a possibility of drawing two

inconsistent conclusions from the evidence does not preclude the agency's finding from being

supported by substantial evidence.  *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927,

936 (Fed. Cir. 1984) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966);

*Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 170 n.3 (C.C.P.A. 1980)).  The court

"may not reweigh the evidence or substitute its own judgment for that of the agency."  *Usinor v.*

*United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted).

 The two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Resources Defense*

*Council, Inc.*, 467 U.S. 837, 842-45 (1984), governs judicial review of the Commission's

interpretation of the antidumping and countervailing duty statutes.  *Nucor Corp. v. United States*,

414 F.3d 1331, 1336 (Fed. Cir. 2005).  First, the court must determine "'whether Congress has

directly spoken to the precise question at issue.'"  *Heino v. Shinseki*, 683 F.3d 1372, 1377 (Fed.

Cir. 2012) (quoting *Chevron*, 467 U.S. at 842).  If Congress's intent is clear, "'that is the end of

the matter . . . .'"  *Id.* (quoting *Chevron*, 467 U.S. at 842-43).  However, "'if the statute is silent

or ambiguous,'" the court must determine "'whether the agency's action "'is based on a

permissible construction of the statute.'"  *Dominion Res., Inc. v. United States*, 681 F.3d 1313,

1317 (Fed. Cir. 2012) (quoting *Chevron*, 467 U.S. at 842-43).

**DISCUSSION**

 Two separate, but parallel, provisions of the Tariff Act of 1930, as amended, provide for

the ITC to determine whether a domestic industry is materially injured, or threatened with

material injury, by reason of unfairly subsidized or dumped imports.  *See* 19 U.S.C. §§ 1671d(b),

1673d(b).  The Commission will issue an affirmative determination if it finds "present material

injury or a threat thereof" and makes a "finding of causation."  *Hynix Semiconductor, Inc. v.*

*United States*, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306 (2006) (quotation marks omitted).

In making a material injury determination, the Commission evaluates "(1) the volume of subject

imports; (2) the price effects of subject imports on domestic like products; and (3) the impact of

subject imports on the domestic producers of domestic like products."  *Id.* (citing 19 U.S.C.

§ 1677(7)(B)(i)(I)-(III)); *accord GEO Specialty Chems., Inc. v. United States*, Slip Op. 09-13,

2009 WL 424468, at *2 (CIT Feb. 19, 2009).  The Commission may also consider "'such other

economic factors as are relevant in the determination.'"  *Hynix Semiconductor*, 30 CIT at 1210,

431 F. Supp. 2d at 1306 (quoting 19 U.S.C § 1677(7)(B)(ii)).

     **I.**     **Volume**

     In performing its volume analysis, the ITC must consider "'whether the volume of

imports of the merchandise, or any increase in that volume, either in absolute terms or relative to

production or consumption in the United States, is significant.'"  *Shandong TTCA Biochemistry*

*Co. v. United States*, 45 CIT __, __, 774 F. Supp. 2d 1317, 1322 (2011) (quoting 19 U.S.C.

§ 1677(7)(C)(i)).

     In the *Views of the Commission*, the ITC found that the volume of cumulated subject

imports grew significantly during the POI, both in absolute terms and relative to apparent

domestic consumption and production.  *Views* at 40-41.  Specifically, cumulated subject imports

grew [[     ]] percent, from [[        ]] to [[          ]] units, and U.S. shipments of subject

imports increased [[     ]] percent, from [[        ]] to [[          ]] units.  *Id.* at 41.  The share

of apparent domestic consumption accounted for by subject imports rose from [[     ]] to [[     ]]

percent, an increase of [[    ]] percent.  *Id.*  Despite this increase in volume, the Commission

concluded that subject imports did not displace a significant volume of domestic industry

shipments from the U.S. market.  *Id.*  It reasoned that, although subject imports increased their

market share, the domestic industry increased its domestic shipments by [[     ]] percent, from

[[         ]] to [[         ]] units.  *Id.* at 41-42.  In other words, subject imports increased their

market share by capturing most of the [[     ]] percent increase in apparent domestic

consumption during the POI.  *Id.* at 42.

Whirlpool was the largest producer of the domestic like product, representing [[

]] domestic production of BMRs.  *Id.* at 16-17.  The ITC found that Whirlpool's lack of a

jumbo capacity BMR and its introduction of a four-door BMR model only in the third quarter of

2010 – two years after the introduction of subject import four-door models – played an important

role in the domestic industry's market share decline.  *Id.* at 42.  Jumbo capacity BMRs accounted

for [[      ]] percent of the growth in apparent domestic consumption, and four-door BMRs

accounted for [[      ]] percent of the increase, during the POI.  *Id.*  Together, jumbo capacity

BMRs and four-door BMRs comprised [[      ]] percent of the growth in apparent domestic

consumption and accounted for [[      ]] percent of the increase in subject imports.  *Id.*  The

Commission therefore determined that, "[b]ecause most of the increase in subject import volume

and market share resulted from increased sales of models that the domestic industry either did

not produce or produced only toward the end of the period examined," the increase did not occur

at the expense of the domestic industry.  *Id.* at 42-43.  The Commission also noted that

"[a]nother significant portion" of subject import volume and market share increase resulted from

[[

]] and that price was not a significant factor in that decisions.  *Id.* at 43.

> **A.**    **Double Counting**

> **a.**    **Whirlpool's Contentions**

Whirlpool asserts that the ITC's volume analysis is not supported by substantial evidence

because it is based on an erroneous finding that jumbo capacity BMRs and four-door BMRs

accounted for [[      ]] percent of the increase in apparent domestic consumption and [[      ]]

percent of the increase in subject imports during the POI.  (Pl.'s Mot. 16.)  According to

Whirlpool, the Commission double counted jumbo capacity BMRs that have four doors when

calculating these figures (counting them first as jumbo capacity BMRs, then as four-door BMRs) and, therefore, understated the degree of competition between subject imports and the domestic like product.  (Pl.'s Mot. 16-18.)  Whirlpool notes that the Commission reached the [[      ]] percent figure by adding (1) third-party internet survey data breaking down the BMR market by capacity, showing that jumbo capacity BMRs accounted for [[      ]] percent of the increase in domestic consumption, and (2) price and quantity data from ITC questionnaire responses for four-door BMR Product Categories[3] 2A and 3A,[4] which indicate that four-door BMRs accounted for [[      ]] percent of the increase in domestic consumption.  (Pl.'s Mot. 17 (citing *Views* at 35 & n.171).)  According to Whirlpool, because Product Category 3A units qualify as both four-door and jumbo capacity BMRs, the Commission double counted four-door, jumbo capacity BMRs in its analysis of the increase in apparent domestic consumption and the increase in subject imports.  (Pl.'s Mot. 17-18 (citing *Views* at 35 & n.171; R. Doc. 169 ("*Staff Report*") at V-9-10).)[5]  According to Whirlpool, when the data are corrected for this double counting, jumbo capacity BMRs and four-door BMRs accounted for only [[      ]] percent of the increase in apparent domestic consumption and [[      ]][6] percent of the rise in subject imports.  (Pl.'s Mot. 18, Confidential Ex. 1.)  Because these figures are significantly lower than the allegedly

---

    [3] In the investigation, the ITC collected sales price data delineated by product specifications set out in the *Staff Report*.  *See* R. Doc. 169 ("*Staff Report*") at V-18-19.  Each enumerated product category has two subcategories, labeled 'A' and 'B.'  The former contain data for the entire market for products meeting the category's specifications; the latter represent data for the top selling stock keeping unit within each category.
    [4] BMRs in Product Category 2A are defined, in relevant part, as having four-doors and a total capacity of 24.5-25.4 cubic feet.  *Staff Report* at V-18.  Product Category 3A models have four doors and a total capacity of over 27.5 cubic feet.  *Id.*
    [5] All citations to the *Staff Report* are to the confidential version.
    [6] Whirlpool transposed the digits in this figure in its moving brief.  (*Compare* Pl.'s Mot. 18, *with* Pl.'s Hr'g Ex. 7.)

erroneous figures relied upon by the ITC, Whirlpool asks the court to remand the case for the

ITC to reconsider its determination.

### b.      Analysis

Neither the *Views* nor the record evidence clearly shows the methodology by which the

Commission determined that jumbo capacity BMRs and four-door BMRs accounted for [[      ]]

percent of the increase in apparent domestic consumption and [[      ]] percent of the rise in

subject imports during the POI.  *See Views* at 34-35 & nn.171 (citing R. Doc. 133 (Hr'g Tr., Mar.

13, 2012) Whirlpool Ex. 7 (Def.-Intervenors Samsung Electronics, Inc. and Samsung Electronics

America, Inc. Opp'n ("Samsung Opp'n") Public App. 53); R. Doc. 178 (Mem. INV-KK-046) at

Table IV-8 (Def.'s Opp'n Confidential App. 55); *Staff Report* at V-60, 62), 173 (citing *Staff*

*Report* at V-60, 62; R. Doc. 178 at Table IV-7 (Def.'s Opp'n Confidential App. 54)).  However,

in its brief, Whirlpool attempted to reverse engineer these calculations and arrived at the

following conclusions, which the Commission does not dispute:

> With respect to the increase in apparent domestic consumption, the ITC found
>
> that jumbo capacity BMRs accounted for [[      ]] percent of that increase, and
>
> four-door BMRs accounted for another [[      ]] percent of the increase.  These
>
> two figures add to the [[      ]] percent figure cited by the Commission.  The ITC
>
> obtained the jumbo capacity BMR figure ([[      ]] percent) from internet survey
>
> data, compiled by a third-party named Traqline, which sought to determine BMR
>
> sales by capacity.  The ITC arrived at the four-door BMR figure ([[      ]] percent)
>
> by adding the volumes reported for price and quantity data for four-door BMR
>
> Product Categories 2A and 3A.  (Pl.'s Mot. 17 (citing *Views* at 35 & n.171),
>
> Confidential Ex. 1.)  BMRs in Product Category 2A were defined, in relevant

part, as having four-doors and a total capacity of 24.5-25.4 cubic feet. *Staff*

*Report* at V-18. Product Category 3A models had four doors and a total capacity

of over 27.5 cubic feet, i.e. jumbo capacity. *Id.* Whirlpool contends that, because

BMRs that fall into Product Category 3A are four-door BMRs with jumbo

capacity, *see id.*, and the Traqline data presumably incorporate all jumbo BMRs,

(*see* R. Doc. 135 at 4 (Defendant ITC's Opposition to Plaintiff's Motion for

Judgment on the Agency Record ("Def.'s Opp'n") Confidential App. 21)), the

Commission counted jumbo capacity, four-door BMRs twice. Whirlpool's

reverse engineering similarly suggests the same double counting in the ITC's

analysis of the rise in subject imports. (*See* Pl.'s Mot. Confidential Ex. 1.)

       In response to this analysis suggesting that double counting occurred, the ITC argues that

the Traqline data organized by capacity do not include four-door BMRs, because another table

based on Traqline data, breaking down the refrigerator market (not limited to bottom mounted

refrigerators) by door configuration, does not mention four-door BMRs. (Def.'s Opp'n 17

(citing R. Doc. 135 at 2 (Def.'s Opp'n Confidential App. 20)).) This evaluation of the Traqline

data, however, is not reflected in the ITC's determination and is, instead, a post hoc rationale

offered by counsel. Moreover, it is undisputed that four-door BMRs, including four-door jumbo

capacity BMRs, existed during the period covered by the Traqline survey(s). *Views* at 42.

Although the survey data on market share by door configuration do not refer to four-door BMRs,

it does not necessarily follow that a separate table, purporting to examine the entire BMR market

by capacity, would necessarily exclude such four-door BMRs. In fact, because the Commission

relied on reproductions of the Traqline data, without examining the supporting data, except for

the overlapping time periods, the record does not indicate that the two tables are based on the

same survey, as the ITC apparently assumed.  In the absence of more information about the

Traqline data and/or further exposition of the ITC's reasoning, the court is unable to find that the

ITC's calculations that jumbo capacity BMRs and four-door BMRs accounted for [[     ]]

percent of the increase in apparent domestic consumption and [[     ]] percent of the increase in

subject imports during the POI is supported by substantial evidence.  *See AWP Indus., Inc. v.*

*United States*, 35 CIT __, __, 783 F. Supp. 2d 1266, 1285 (2011) (holding that "Commission

must . . . disclose its reasoning, explaining how it has used its discretion in making its

determination and 'articulate a [] rational connection between the facts found and the choice

made.'") (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-68 (1962))

(brackets in original).

The ITC contends that even if double counting occurred, the court nevertheless should

affirm its volume findings because the mistake amounts to harmless error.  (Def.'s Opp'n 18);

*see Ranchers-Cattleman Action Legal Found. v. United States*, 23 CIT 861, 883, 74 F. Supp. 2d

1353, 1373 (1999) (holding that court need not remand if it finds "there is not substantial doubt

as to whether the ITC would have reached the same conclusion" despite error); *U.S. Steel Grp. v.*

*United States*, 18 CIT 1190, 1215, 873 F. Supp. 673, 696 (1994) (same).  In its analysis, the

Commission found that the increase in subject import volume and market share did not occur at

the expense of the domestic industry because "*most* of the increase" occurred in jumbo capacity

BMRs and four-door BMRs.  *Views* at 42-43 (emphasis added).  Consequently, it reasons that,

even employing Whirlpool's corrected figures, jumbo capacity BMRs and four-door BMRs

would still account for more than half of the increase in subject import volume and total market

share.  Therefore, absent the error, the Commission argues that it would have reached the same

conclusion.  (Def.'s Opp'n 18-19.)

In this case, the court has sufficient doubt that the ITC would have reached the same

conclusion that it must remand the determination so that the Commission, and not the Court, may

fill in the gaps as to the data the Commission relied on, how it evaluated that data, and the

conclusions it drew from that evaluation.  The Commission's argument to the court that it should

rely on the use of the word "most" in the Commission's determination simply places too much

emphasis on that word choice in light of the potentially significant difference in the percentages

relied on by the Commission and those presented by Whirlpool.  On remand, the Commission

must further evaluate its reliance on the Traqline data, re-evaluate the percentage of increase in

apparent domestic consumption and subject imports accounted for by jumbo capacity BMRs and

four-door BMRs, and may further consider any other information relevant to its volume analysis.

The Commission is also directed to reconsider any determinations made as a consequence of or

in reliance on its volume analysis, to the extent necessary and appropriate.

**B.      Jumbo BMR Models as a Distinct Market Segment**

**a.      Whirlpool's Contentions**

Whirlpool contends that the ITC did not support, with substantial evidence, its conclusion

that jumbo capacity BMRs, those with a capacity at or exceeding 27.5 cubic feet, did not

compete with smaller models.  (Pl.'s Mot. 21-24.)  According to Whirlpool, nothing in the record

indicates that 27.5 cubic feet serves as a meaningful dividing line in the BMR market.  (Pl.'s

Mot. 21-22.)  In addition, Whirlpool points to record evidence allegedly demonstrating that

jumbo models compete with smaller BMRs.  (*See* Pl.'s Mot. 22-23.)  For example, Whirlpool

stresses that jumbo and non-jumbo capacity BMRs "were both sold to the same set of retailers,

displayed on the same set of retailers' floors and were designed to fit into the same kitchen

spaces."  (Pl.'s Mot. 23 (citing *Views* at 11-12, 22-23; *Staff Report* at I-16-17; R. Doc. 176 at 10

(Pl.'s Mot. Public App. 91)).)  Whirlpool also avers that the Commission cannot reconcile the

establishment of a distinct jumbo market segment with its use of wide ranges of BMR size in its

competitive pricing analyses.  (Pl.'s Mot. 23 (citing *Staff Report* at V-9).)  Whirlpool further

asserts that the ITC's finding of a market trend toward larger refrigerators evidences competition

between larger and smaller models; "[b]ecause the refrigerator market is largely a replacement

market, a rise in sales of one type of refrigerator model is necessarily at the expense of other

types."  (Pl.'s Mot. 23 (footnote omitted).)

### b.    Analysis

The ITC's decision to treat jumbo BMRs as a distinct segment of the BMR market is

supported by substantial evidence.  First, record evidence indicates that consumers "consistently"

paid a substantial premium for jumbo capacity BMRs over "the most comparable domestically

produced models."  *Views* at 34 n.170 (citing R. Doc. 174 (LG Final Comments) at 5 (Def.'s

Supp. Br. 6)).[7]  For example, jumbo capacity BMRs in Product Category 3A commanded a

$[[    ]] to $[[     ]] premium per unit over the comparable non-jumbo domestic like product in

Product Category 2A for all but one quarter in the POI.  *Id.* (citing *Staff Report* at V-60, 62).

Similarly, jumbo capacity BMRs in Product Category 5A earned a $[[     ]] to $[[     ]] premium

per unit over the comparable non-jumbo domestic like product in Product Category 6A.  *Id.*

(citing *Staff Report* at V-66, 68).

Second, the cleavage between the jumbo and non-jumbo capacity BMR markets played a

significant role in Whirlpool's loss of a [[

---

[7]  The ITC mistakenly referred to this document as Samsung's Final Comments in the
*Views*.  (Def.'s Supp. Br. 1.)

]].” *Id.* (citing *Staff Report* at V-92).

Finally, the ITC found that the evolving structure of the BMR market toward jumbo models

reinforced the distinct position that jumbo BMRs hold in the broader market. *Id.* (“‘[T]here has

been a movement to larger bottom-mount refrigerators, over 27 cubic foot [sic], which has been

led by Samsung and LG.’ . . . There would have been no such movement if consumers viewed

smaller, cheaper domestically produced bottom mount refrigerators as an acceptable substitute

for subject imported jumbo bottom mount refrigerators.”) (quoting R. Doc. 185 at 28:20-22

(Def.’s Opp’n Public App. 11)) (internal citations omitted); *see* R. Doc. 133 Whirlpool Ex. 7

(Samsung Opp’n Public App. 53).

These findings provide substantial evidence to support the conclusion that jumbo

capacity BMRs, i.e. BMRs with a capacity greater than 27.5 cubic feet,[8] constitute a sufficiently

distinct segment of the BMR market from smaller BMRs to evaluate the extent of competition

between BMRs of these various sizes and to find that there is limited competition between jumbo

and non-jumbo capacity BMRs.  That Whirlpool can point to record evidence that supports a

contrary finding is of no moment.  *Matsushita Elec. Indus. Co.*, 750 F.2d at 936.

### C.      The Treatment of Whirlpool’s Four-Door Model

#### a.      Whirlpool’s Contentions

Whirlpool asserts that the ITC’s determination that competition between subject imports

with four doors and the domestic like product was attenuated is not supported by substantial

evidence.  (Pl.’s Mot. 18-19.)  Specifically, it contends that the ITC essentially ignored

---

[8] To the extent that Whirlpool questions the ITC’s use of 27.5 cubic feet as the dividing
line between non-jumbo capacity and jumbo capacity BMRs, the record contains adequate
support for the ITC’s decision under the substantial evidence standard.  In addition to the points
(footnote continued)

Whirlpool's introduction of a four-door BMR model in the third quarter of 2010 by "impl[ying] that most of the growth of subject imports of four door models occurred before" that time.  (Pl.'s Mot. 19 (emphasis removed).)  According to Whirlpool, correcting for this omission reveals that [[      ]] percent of four-door subject import sales during the POI occurred after Whirlpool introduced its four-door model.  This statistic, in turn, allegedly necessitates a finding that competition between subject imports with four doors and the domestic like product was not attenuated.  (Pl.'s Mot. 19 (citing *Staff Report* at V-60, 61; (Pl.'s Mot. Confidential Ex. 3)).)

### b.    Analysis

Whirlpool mischaracterizes the Commission's findings in its *Final Determination*.  The court does not read the *Views of the Commission* as implying that most of the market growth for four-door subject imports occurred prior to the release of Whirlpool's four-door BMR; rather, the ITC acknowledged Whirlpool's belated launch of a four-door BMR and noted that this late entry was one of several factors that lead it to conclude that "competition between subject imports and the domestic like product was attenuated to some extent" during the period of investigation. *Views* at 35.  Whirlpool does not dispute that the ITC accurately determined that Whirlpool introduced its four-door BMR later than Samsung and LG.  The sales data contained in Table V-22 of the *Staff Report* (showing that Whirlpool's sales of four-door BMRs [[

                   ]] to the growth of subject import four-door BMRs over an earlier period of time) provides reasonable support for the Commission's conclusion that this timing difference was a relevant factor in analyzing the competition between subject imports and the domestic like product.

---

made above, during the POI, Whirlpool did not manufacture any BMRs larger than 27.4 cubic feet. *Views* at 34 n.170 (citing *Staff Report* at V-92).

### D.   The Treatment of Four-Door and Jumbo BMR Models

#### a.   Whirlpool's Contentions

Whirlpool proposes an alternative methodology for the ITC's competition analysis which would exclude the data for subject imports of jumbo capacity and four-door BMRs sold prior to the third quarter of 2010, the date when Whirlpool released a four-door model into the market. Whirlpool asserts that this alternative method would focus the analysis on what it terms the "competitive segment of the refrigerator market." (Pl.'s Mot. 19-20.)  With this modification, subject imports increased from [[          ]] units in 2009 to [[          ]] units in 2011, their market share increasing [[    ]] percent during the POI, from [[    ]] to [[    ]] percent.  (Pl.'s Mot. 19-20 (citing Pl.'s Mot. Confidential Ex. 2).)  According to Whirlpool, these figures demonstrate the "substantial overlap" in the volume of subject imports in direct competition with the domestic like product, and thereby preclude the Commission's finding of attenuated competition between subject imports and the domestic like product.  (Pl.'s Mot. 20 (quotation marks omitted).  This heightened level of competition, in turn, reveals "a [[

                                                        ]]."  (Pl.'s Mot. 20.)

#### b.   Analysis

The ITC has "'broad discretion'" in choosing a methodology for measuring volume. *Aluminum Extrusions Fair Trade Comm.*, 36 CIT at __, 2012 WL 5201218, at *11 (quoting *Int'l Imaging Materials, Inc. v. ITC*, 30 CIT 1181, 1189 (2006)).  "As long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the court will not . . . question the agency's methodology." *Int'l Imaging Materials*, 30 CIT at 1189 (quoting *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986)) (first ellipses in original).  When presented with a challenge to the Commission's

methodology, the court's examines "not what methodology [Plaintiff] would prefer," but

"whether the methodology actually used by the Commission was reasonable."  *Shandong TTCA*

*Biochemistry*, 45 CIT at __, 774 F. Supp. 2d at 1329 (quotation marks omitted).

The ITC's inclusion of jumbo capacity and four-door subject imports sold prior to the

third quarter of 2010 in its competition analysis was reasonable.  Section 1677(7)(B)(i)(I)

provides that the ITC "shall consider . . . the volume of *imports of the subject merchandise*" in its

analysis.  19 U.S.C. § 1677(7)(B)(i) (emphasis added).  As noted previously, subject

merchandise in this case encompasses all BMRs in the scope of the petition, including jumbo

capacity and four-door BMRs sold prior to the third quarter of 2010.  *See Views* at 5-7.

Retaining those sales in the calculations is consistent with this statutory provision.

Similarly, the ITC's inclusion of jumbo capacity and four-door BMRs sold prior to the

third quarter of 2010 in its analysis comported with the requirements of 19 U.S.C. § 1677(7)(C).

Subsection (7)(C)(i) directs the Commission to "consider whether the volume of imports of

[subject] merchandise, or any increase in that volume . . . is significant."  19 U.S.C.

§ 1677(7)(C)(i).  Subsection (7)(C)(iii) explicitly requires the Commission to "evaluate all

relevant economic factors which have a bearing on the state of the industry in the United States,

including, but not limited to – (I) actual and potential . . . sales [and] market share" and to

"evaluate all relevant economic factors . . . within the context of the business cycle and

conditions of competition that are distinctive to the affected industry."  19 U.S.C.

§ 1677(7)(C)(iii).  During the POI, jumbo capacity and four-door BMRs accounted for the

greatest increase in subject import volume and consumption, *see Views* at 34-35, 42, and it was

the domestic industry's limited ability to compete in this segment of the market which led the

Commission to conclude that the increase in subject imports did not come at the domestic

industry's expense, *id.* at 42-43.  Given the importance of jumbo capacity and four-door BMRs

in the market, the ITC reasonably included jumbo capacity and four-door BMRs sold prior to the

third quarter of 2010 in its analysis.  *See* 19 U.S.C. § 1677(7)(C); *see also Views* at 20-35 &

n.170 (describing conditions of competition within BMR market, including importance of

capacity and four-door configuration to consumers), 42-43 (explaining significance of jumbo

capacity and four-door BMRs in domestic market).

>        **II.**      **Price Effects**

>        To determine the effects of subject imports on U.S. prices of the domestic like products,

the Commission inquires:  (1) whether there has been "significant price underselling by the

imported merchandise as compared with the price of domestic like products" and (2) whether

"the effect of imports of such merchandise otherwise depresses prices to a significant degree or

prevents price increases, which otherwise would have occurred, to a significant degree."  19

U.S.C. § 1677(7)(C)(ii)(I)-(II); *accord Shandong TCA Biochemistry*, 45 CIT at __, 774 F. Supp.

2d at 1326.

>        In the *Views of the Commission*, the ITC found that several factors complicated its

pricing analysis.  First, it found BMRs to be "highly differentiated products that continued to

evolve during the period examined, with the introduction of new or improved features and

greater capacity."  *Views* at 44.  This phenomenon led consumers to attach value to competing

models "based on each consumer's subjective judgment regarding the value of unique

combinations of features, capacity, brand, reliability, physical dimensions, and styling, among

other things."  *Id.*  Second, the Commission concluded that the market's pricing practices "are

characterized by manufacturer efforts to guide retail prices via MAPs [minimum advertised

prices], independent retailer decisions to offer bottom mount refrigerators at prices below MAPs,

and pervasive, periodic discounting that intensified during the period examined." *Id.* Finally, it found that, although price is "an important factor" in the BMR market, "myriad" non-price factors, "including features, capacity, brand, reliability, physical dimensions, and fit, feel, and finish," are also important. *Id.*

Despite these complications, the ITC determined that record sales price data showed that subject import price underselling was "not significant" during the POI, because subject imports oversold the domestic like product in a majority of quarterly comparisons by "significant margins." *Id.* at 51-52. Pricing data for all sales of BMRs meeting the ITC's six product category definitions, *see Staff Report* at V-18-19, showed that subject imports oversold the domestic like product in [[    ]] of [[    ]] quarterly comparisons, or [[        ]] percent of the time, at margins of [[    ]] to [[        ]] percent, *Views* at 52. Pricing data for sales of the top-selling stock keeping units ("SKUs") for each product category, *see Staff Report* at V-18-19, indicated that subject imports oversold the domestic like product in [[    ]] of [[    ]] quarterly comparisons, or [[        ]] percent of the time, at margins ranging from [[    ]] to [[        ]] percent, *Views* at 52.

The Commission also found that subject imports did not depress domestic like product prices "to a significant degree," due to the absence of any clear correlation between subject import underselling and declining domestic prices. *Id.* at 53. It observed that reported prices, net of direct and indirect discounts, on domestically produced products declined between the first and last quarters with available data by [[    ]] to [[      ]] percent. *Id.* However, while domestic prices declined for Product Categories 1A, 1B, 2A, and 2B when subject imports generally undersold the domestic like product, domestic prices for Product Categories 4A, 4B, 6A, and 6B declined when subject imports generally oversold the domestic like product. *Id.* In fact,

domestic prices for products which were generally oversold by subject imports declined by a

greater percentage than those which were generally undersold. *Id.*

 The ITC further determined that subject imports did not suppress domestic like product

prices to a significant degree. *Id.* at 54. It noted that the domestic industry experienced a cost-

price squeeze during the POI, with the ratio of domestic industry cost of goods sold ("COGS") to

net sales rising from [[      ]] to [[      ]] percent. *Id.* at 54-55. However, the ITC reasoned that

subject import price competition did not significantly contribute to the domestic industry's

inability to raise prices for two reasons. First, the cost-price squeeze did not correspond to

increases in subject import market share or substantial underselling, and the pricing data did not

indicate that subject import pricing operated as a ceiling on domestic prices. *Id.* at 55. For

example, the greatest increase in the domestic industry's COGS to net sales ratio occurred

between 2010 and 2011, a period during which subject import market share declined [[     ]]

percent, along with the incidence of subject import underselling. *Id.* Second, the Commission

found that the previously mentioned complexity of the BMR market inhibited the domestic

industry from passing on cost increases through higher prices. *Id.* at 55-56.

 In further support of its price effects determination, the Commission highlighted the

absence of confirmed domestic industry allegations of lost sales and revenues. *Id.* at 56. During

the POI, Whirlpool lost two sales to [[                              ]], in 2009 and 2011. *Id.* As

discussed later, the ITC found that price did not play a significant role in [[

                                                        ]] or its

decision to [[                                      ]]. *Id.* at 587-59.

### A.      The Standard of Review for ITC Methodology Challenges

Whirlpool's challenges to the ITC's underselling analysis primarily question the

methodologies employed by the ITC.  The ITC has "broad discretion" in selecting the

appropriate methodology to review subject import price effects, *Hynix Semiconductor*, 30 CIT at

1215, 431 F. Supp. 2d at 1310-11, and may use the methodology of its choice as long as it is

reasonable, *Shandong TTCA Biochemistry*, 45 CIT at __, 774 F. Supp. 2d at 1327, 1329.  When

presented with a challenge to the Commission's methodology, the court examines "not what

methodology [Plaintiff] would prefer, but . . . whether the methodology actually used by the

Commission was reasonable." *Id.*  As discussed below, with regard to these claims, even if

Whirlpool presents what may have been considered a reasonable methodology if it had been

adopted by the Commission, in each case, Whirlpool has failed to demonstrate that the

Commission's methodology was not reasonable, and the court, therefore, affirms the agency's

determination.

### B.      Data Aggregation

#### i.      Whirlpool's Contentions

Whirlpool claims that the ITC's underselling analysis is not supported by substantial

evidence or in accordance with law because it "distorts" the record evidence by employing

"perfunctory aggregate calculations of quarters of overselling and underselling."[9]  (Pl.'s Mot.

24.)  According to Whirlpool, instead of examining the number of quarters with under- and

overselling for all product categories together, the ITC should have examined each category's

number of over- and underselling quarters independently.  (Pl.'s Mot. 24.)  This calculation

---

[9] Whirlpool repeats this claim in the price depression and suppression portion of its brief. (*See* Pl.'s Mot. 33-35.)

would have revealed that, for Product Categories 1A, 2A, and 4A, subject import underselling

occurred in most quarters; [[


]].  (Pl.'s Mot. 25.)  Whirlpool concedes that its calculation

method would have shown that [[                                          ]] the domestic like product for

Product Category 6A.  However, it asserts that the ITC should have ignored this finding, because

"the feature parameters for Product 6A were considerably looser" than for the other product

categories and, therefore, skew the data.  (Pl.'s Mot. 25 & n.17.)  Whirlpool's proposed

methodology omits data for Product Categories 1B, 2B, 4B, and 6B without explanation.[10]

*Compare Views* at 52-53, *with* (Pl.'s Mot. 24-26).

### ii.    Analysis

Whirlpool has failed to demonstrate that the Commission acted unreasonably in its

underselling analysis by (1) using the price data for all available product categories or (2)

considering that data in the aggregate.  Section 1677(7)(C)(ii) states in relevant part that, "[i]n

evaluating *the effect of imports of such merchandise [subject merchandise]* on prices, the

Commission shall consider whether-- (I) there has been significant price underselling by the

imported merchandise as compared with the price of domestic like products."  19 U.S.C.

§ 1677(7)(C)(ii) (emphasis added).  Similarly, 19 U.S.C. §§ 1671d(b)(1) and 1673d(b)(1) require

the ITC to examine the domestic industry as a whole in making its injury determinations.  *See* 19

U.S.C. §§ 1671d(b)(1), 1673d(b)(1).  Together, these statutes provide that the ITC is to examine

all subject imports and the entire domestic like product; it may not selectively omit market

---

[10] Product Categories 3, 5, and 7 (both A and B categories) are not discussed because
there were no sales by the domestic industry reported for those product categories.  *See Staff*
(footnote continued)

segments without reason.  *See Nippon Steel Corp. v. United States*, 25 CIT 1415, 1425, 182 F.

Supp. 2d 1330, 1341 (2001).

In light of these statutory provisions, the Commission performed its underselling analysis

in a reasonable manner.  Product Category 6A, which Whirlpool seeks to remove from

consideration, accounted for [[      ]] percent of domestic BMR sales and [[      ]] percent of the

sum of subject imported products 1A, 2A, 4A, and 6A (i.e., those product categories for which

there were also sales of domestic like product) during the POI.  *See Staff Report* at V-58, 60, 64,

68.  Likewise, Product Category 6B comprised [[      ]] percent of the Product Category "B"

sales and [[      ]] percent of the total of subject imports of products 1B, 2B, 4B, and 6B.  *See*

*Staff Report* at V-59, 61, 65, 69.  The large size of the BMR market occupied by Product

Category 6 made the ITC's inclusion of its data in the calculations reasonable.  Moreover,

Whirlpool's only argument for excluding Product Category 6A, due to its allegedly broad feature

parameters, did not warrant the product category's removal from the Commission's analysis.  In

its determination, the Commission noted that "[t]he definition of product 6 [was] no less specific

with respect to features than the definitions of products 1-5," with the exception of the inclusion

of models with single and double evaporators.  *Views* at 51 n.247.  The Commission further

concluded that models with single and dual evaporators had similar production costs and prices,

which negated the significance of having models with differing numbers of evaporators in

Product Category 6.  *See id.* at 48 n.229, 51 n.247 (citing *Staff Report* at V-18-19; R. Doc. 185 at

221 (Defendant-Intervenors LG Electronics, Inc. and LG Electronics USA, Inc. ("LG Opp'n")

Public App. 79)).  It further noted that there is evidence that domestically produced Product

Category 6 BMRs "generally possessed larger capacities" than their subject import counterparts,

---

*Report* at V-32, 33, 36, 37, 40, 41.

which would tend to favor Whirlpool. *Id.* at 51 n.247 (citing R. Doc. 151 (Samsung's Post-Hr'g

Br.) at A-21-22, Ex. 6 (LG Opp'n Confidential App. 77-80)). By examining pricing data across

all BMR product categories for which it possessed data, including Product Category 6, and by

examining that data in the aggregate, the ITC's calculation reasonably reflected the state of the

domestic BMR market as a whole. *See Nippon Steel*, 25 CIT at 1425-26, 182 F. Supp. 2d at

1340-41.

## C.     Feature Dumping

### i.  Whirlpool's Contentions

Whirlpool argues that the ITC's underselling analysis methodology also unlawfully failed

to account for feature differences between subject imports and domestic like product BMRs, in

contravention of the Court's holding in *Maine Potato Council v. United States*, 9 CIT 460, 617 F.

Supp. 1088 (1985). (Pl.'s Mot. 26-28.) Whirlpool contends that if subject imports exceeded the

domestic like product in quality and design, as the ITC concluded, *Views* at 47 n.225, "one

would expect a price premium relative to the comparable domestic products." (Pl.'s Mot. 27.)

However, according to Whirlpool, subject imports did not command a consistent price premium,

demonstrating that they exerted downward pressure on the prices of the domestic like product.

(Pl.'s Mot. 27.) The ITC's alleged failure to account for feature differences in subject import

prices masked this downward pressure. Moreover, Whirlpool avers that if the Commission

determined that it could not adjust the pricing data for specific feature differences between

subject import BMRs and domestic like product, the Commission should have "deemphasized"

the aggregate underselling data and "focused instead on price depression and price suppression

in the product pricing comparisons where the most significant feature differences did not exist."

(Pl.'s Mot. 27-28.)

ii.  **Analysis**

Whirlpool has not shown that the ITC was unreasonable in the manner in which it accounted for feature differences between subject imports and domestic like product BMRs. Case law indicates that the Commission should account for significant quality differences between products, though not necessarily by assigning the differences monetary value.  *See Maine Potato Council*, 9 CIT at 460-61, 617 F. Supp. at 1089-90.  For example, in *Maine Potato*, the court affirmed the ITC's decision not to quantify quality differences in subject imports due to "wide fluctuations" in overselling margins and inconsistent respondent views about which subject import characteristics demarked higher quality.  9 CIT at 461, 617 F. Supp. at 1090. During its investigation, the ITC collected BMR pricing data "on the basis of pricing products defined to include specific features," which enabled it to conduct "probative price comparisons" between subject imports and the domestic like product sales with similar features.  *Views* at 47 (citing *Staff Report* at V-18-19, 58-71).  In other words, contrary to Whirlpool's assertion, the ITC designed its questionnaire and the product categories defined therein to control for relevant feature differences between BMR models.

In its analysis of the pricing data, the ITC determined that it could not place a monetary value on any remaining feature differences within these product categories for several reasons. First, in circumstances similar to those in *Maine Potato*, *see* 9 CIT at 461, 617 F. Supp. at 1090, it found that subject imports' superior design and quality, when compared to the domestic like product, commanded "no consistent premium . . . with wide fluctuations in margins of overselling and some underselling as well."  *Views* at 47 n.225 (citing *Staff Report* at V-58-61, 64-65, 68-69).  Moreover, assigning values to various feature differences would require the ITC to make "subjective judgments," particularly because "consumers (and by extension retailers)

value a manufacturer's bottom mount refrigerator not by tallying up the value of individual

features but rather based on the total value of its product offering at the price at which it is

offered for sale." *Id.* at 48 (citing R. Doc. 150 (Whirlpool Post-Hr'g Br.) at II-1 (Samsung

Opp'n Confidential App. 47); R. Doc. 185 at 33, 220-21 (LG Opp'n Public App. 75, 78-79))

(quotation marks omitted); *see id.* at 47 n.225, 48 & n.229 (elaborating on futility of

incorporating feature differences into price).   Consequently, the Commission concluded that any

value that it might assign to different BMR features would not reliably reflect the value of these

features in the marketplace.  *Id.* at 47.   In addition, the Commission determined that it could not

incorporate feature differences into BMR pricing due to evidence that "the values manufacturers

assign to different features for MAP purposes are unrelated to their costs or their values in the

marketplace." *Id.* at 48 (citing R. Doc. 132 (Whirlpool Hr'g) Ex. 14 (Def.'s Supp. Br. 10); R.

Doc. 58 (Staff Conference Tr., Apr. 20, 2011) at 78-79 (Def.'s Supp. Br. 13-14); R. Doc. 185 at

221 (LG Opp'n Public App. 79)).   Given these obstacles, the court concludes that the

Commission accounted for the feature differences between BMR models to the extent that it was

able to and that its determination not to further quantify any feature differences was reasonable.

### D.   LG's Pricing Data

### i.   Whirlpool's Contentions

Whirlpool asserts that the ITC's underselling analysis is unsupported by substantial

evidence and not in accordance with law because the agency examined Samsung and LG's

pricing data in the aggregate.   Whirlpool contends that the ITC should have examined the data

for each producer separately because:  (1) LG and Whirlpool's product lines were more similar

to each other's than Samsung's,[11] (2) evidence showed that "[[

]]," and (3) the

ITC found that many of LG's net prices inaccurately accounted for discounts and rebates.  (Pl.'s

Mot. 28-29.)  Whirlpool argues that the ITC should have used the data from whichever of the

two companies had the lowest product-specific quarterly price relative to Whirlpool, a method

which Whirlpool labels "price leadership."  (Pl.'s Mot. 28.)

### ii.  Analysis

Whirlpool has not shown that the Commission acted unreasonably by examining

Samsung and LG's pricing data together.  During its investigation, the Commission recognized

that LG's pricing and discount data were "potentially problematic" due to inaccurate accounting

for discounts and rebates.  *Views* at 51.  However, the Commission reasonably decided to use the

data because it was the only pricing data available for one of the two major importers of subject

merchandise.[12]  *Id.*; *see* 19 U.S.C. §§ 1671d(b)(1) (instructing ITC to examine price effects of

subject imports as a whole), 1673d(b)(1) (same), 1677(7)(C)(ii) (same).  Excluding LG's data

from the Commission's analysis would have removed nearly [[        ]] of subject imports from

the analysis.  To compensate for the data's potential deficiencies, the Commission instead

"attach[ed] less weight to it" in its calculations[13] and also repeated the same analysis without

LG's data, reaching the same conclusion.  *Views* at 51-53.  Because the Commission performed

---

[11]  [[                                                                      ]]  *See
Staff Report* at I-16-17.
    [12]  In 2011, LG was [[          ]] importer of subject merchandise, accounting for
[[    ]] percent of imports.  *Staff Report* at IV-2.
    [13]  The court cannot determine from the record how the ITC attached less weight to LG's
data, and, during oral argument, counsel for the government conceded that he also could not
provide an explanation.  (Hr'g Tr. 1:40-42, Nov. 7, 2013.)

its analysis in two ways in order to mitigate any potential distortion in LG's data, the court finds

that the Commission's use of LG's data was reasonable.

### E.    Price Depression and Suppression

Whirlpool makes numerous challenges to the Commission's determinations that subject

import price competition did not significantly depress or suppress prices of the domestic like

product.  (Pl.'s Mot. 31-41.)  The court addresses each in turn.

### i.  Predominant Underselling

Whirlpool argues that the ITC did not act in accordance with law when it found no

significant price depression or suppression by subject imports in the presence of falling domestic

prices for selected BMRs, net of direct and indirect discounts.  According to Whirlpool, the ITC

unlawfully assumed that price depression and suppression cannot occur without "predominant"

underselling by subject imports.  (Pl.'s Mot. 31-35, 40.)  Whirlpool directs the court to 19 U.S.C.

§ 1677(7)(C)(ii), which instructs that factors other than underselling may lead to a price

depression or suppression finding, and case law in which the Commission has found price

suppression in a mixed under- and overselling context.  (Pl.'s Mot. 32 (citing *Shandong TTCA*

*Biochemistry*, 45 CIT at __, 774 F. Supp. 2d at 1332; *Companhia Paulista de Ferro-Ligas v.*

*United States*, 21 CIT 473, 478 (1996)).)

Whirlpool mischaracterizes the basis of the Commission's findings.  The Commission

found that prices of domestic like product fell in the presence of both underselling and

overselling of subject imports, with prices declining more rapidly during periods of overselling.

*Views* at 53 (citing *Staff Report* at V-58-61, 64-65, 68-69).  In this situation, the Commission

could not discern a clear correlation between subject import underselling and declining domestic

prices.  *Id.*  It was for this reason that the ITC found no significant price depression by subject

imports.  Similarly, the ITC concluded that subject import price competition did not significantly

contribute to price suppression because (1) the domestic industry's cost-price squeeze did not

correspond to increases in subject import market share or substantial underselling; (2) pricing

data did not indicate that subject import pricing placed a ceiling on domestic prices; and (3) the

complexity of the BMR market, *see supra*, prevented the domestic industry from passing on

costs increases to the consumer.  *Views* at 54-56 (citing *Staff Report* at V-58-61, 64-65, 68-69,

VI-1 & n.2; R. Doc. 178 at Table IV-4 (Pl.'s Mot. Confidential App. 41)).  Stated differently, the

*Views of the Commission* do not indicate that the Commission assumed that price depression and

suppression cannot occur absent predominant underselling and, therefore, Whirlpool's

contentions are without foundation.

### ii.  Price Depression

Whirlpool maintains that the ITC lacked substantial evidence for three of its explanations

as to why subject import competition did not cause domestic producer prices to fall:  (1) much of

the subject import market share increase occurred in the jumbo market, which Whirlpool did not

serve; (2) Whirlpool would not have cut prices to meet subject import prices because subject

import prices were generally higher in 2010 and 2011; and (3) BMR prices decline as a model's

life cycle progresses over the course of two to six years.  (Pl.'s Mot. 36 (citing *Views* at 53-54).)

Whirlpool avers that correcting for the ITC's alleged double counting of four-door,

jumbo models, discussed *supra*, reveals that "the rise of 'jumbo' imports . . . was not as

significant as the Commission thought."  (Pl.'s Mot. 36.)  Because this argument hinges on the

effects of the Commission's alleged double counting, and the court has remanded the double

counting issue to the Commission for further explanation and analysis, the court remands this

finding as well.

In the *Views of the Commission*, the ITC concluded that Whirlpool would not have cut

prices to match subject import prices because subject import prices were higher than Whirlpool's

prices in 2010 and 2011.  *Views* at 54.  Whirlpool characterizes this argument as a legally

incorrect statement that price depression by reason of subject imports occurs only in the presence

of underselling.  (Pl.'s Mot. 36.)  Whirlpool previously raised this argument, (*see* Pl.'s Mot. 32-

35, 40), and the court already found that Whirlpool's contention lacks foundation, *see supra*

§ II(E)(i).  The *Views of the Commission* does not indicate that the Commission assumed that

price depression and suppression cannot occur absent predominant underselling.

As to the product life cycle argument, Whirlpool asserts that the ITC did not support with

substantial evidence its finding that product life cycles, rather than competition from subject

imports, caused domestic producer prices to fall.  Specifically, Whirlpool stresses that it

launched a Product Category 2A four-door model in the third quarter of 2010 for [[         ]].

By the third quarter of 2011, its price had fallen [[     ]] percent to [[         ]].  (Pl.'s Mot.

37-38 (citing *Staff Report* at V-60).)  During this period, subject imports [[          ]] the model

[[               ]], from [[     ]] to [[     ]] percent.  (Pl.'s Mot. 38 (citing *Staff Report* at V-60).)

Likewise, Whirlpool introduced a Product Category 4A model in the second quarter of 2009 for

[[          ]], and by the first quarter of 2010, its price had fallen [[        ]] percent, during a

period in which subject imports [[           ]] domestic models every quarter.  (Pl.'s Mot. 38

(citing *Staff Report* at V-64).)  According to Whirlpool, these figures demonstrate a causal nexus

between subject import competition and declines in domestic producer prices.

Be that as it may, the ITC supported its conclusion with substantial evidence.  In its

analysis, the ITC underscored that Whirlpool had made "[[

                                                        ]]" in 2011.  *Views* at 54 (citing *Staff Report* at

VI-5 n.4) (quotation marks omitted).  It also noted that Whirlpool had described a "typical[]"

BMR life cycle as two to three years, with a maximum of six years.  *Id.* at 23 (citing *Staff Report*

at V-13), 54.  In light of these market conditions, and previous ITC findings that the BMR

market's emphasis on style and design led model prices to decline as "new, more innovative or

stylish models are introduced," *id.* at 23 (citing *Staff Report* at V-13), the ITC concluded that the

life cycle of Whirlpool's models, which would soon be replaced by newer, more advanced

models, played a significant role in their price declines, *id.* at 54 (citing *Staff Report* at VI-5 n.4).

Moreover, Whirlpool failed to show that the Commission's aggregate analysis was unreasonable

and the fact that selective pieces of record evidence may support Whirlpool's conclusion does

not detract from the soundness of the Commission's findings.[14]  *Matsushita Elec. Indus.*, 750

F.2d at 933.

### iii.  Price Suppression

Finally, Whirlpool asserts that the ITC did not support with substantial evidence its

conclusion that the domestic industry's inability to raise prices between 2010 and 2011 did not

stem significantly from subject imports.  According to Whirlpool, the Commission's recognition

that the perceived value of a BMR is based on its features and price; that consumers make their

purchasing decisions on differing and subjective evaluations; and that producers engaged in

fierce price discounting rationally lead only to the conclusion that subject imports inhibited

Whirlpool's ability to raise prices.  (Pl.'s Mot. 39-40 (citing *Views* at 50).)  Whirlpool also

claims that the Commission ignored testimony that Whirlpool could not raise prices in 2011 due

to the market share it lost from 2009 and 2010, (Pl.'s Mot. 40 (citing *Views* at 54-56)), and

---

[14] Moreover, the Commission found that other factors in addition to product life cycles
contributed to domestic producer price declines.  *See Views* at 53-54.

contends that the stabilization of its market share after cutting prices in 2011 shows that subject imports suppressed domestic prices, (Pl.'s Mot. 40).[15]

Substantial evidence supports the ITC's finding that subject imports did not cause, to a significant degree, the domestic industry's inability to raise prices between 2010 and 2011. When examining the domestic industry's cost-price squeeze during the POI, the Commission found that the squeeze did not correspond to increases in subject import market share or substantial underselling. *Views* at 55. Specifically, it noted that the majority of the increase in the domestic industry's COGS to net sales ratio occurred between 2010 and 2011, when the incidence of underselling and subject import market share fell by [[     ]] percent. *Id.* (citing *Staff Report* at V-58-59, 64-65, 68-69, VI-3; R. Doc. 178 at Table IV-4 (Pl.'s Mot. Confidential App. 41)). In addition, the Commission found that the complexity of the BMR market – with its evolving array of models, features, and aggressive price discounting, as well as consumers' making purchase decisions based upon differing, subjective evaluations – was "too complex" and had "too many factors" to permit it to conclude that subject imports inhibited the domestic industry from passing on cost increases through higher prices. *Id.* at 55-56. The court will not disturb the Commission's findings.

---

[15] Whirlpool additionally claims that the Commission ignored coincident declines in the prices of subject imports and the domestic like product prices for several product categories, as well as testimony provided by one of Samsung's witnesses. (Pl.'s Mot. 40-41.) The ITC is not required to address every individual speck of evidence in the record, and the court presumes the agency examined all relevant evidence absent a showing to the contrary. *Aluminum Extrusions Fair Trade Comm.*, 36 CIT at __, 2012 WL 5201218, at *2. Whirlpool makes no such showing.

### III.   Impact

#### A.   Lost Sales Analysis

##### i.   Whirlpool's Contentions

Whirlpool argues that the ITC's conclusion that a [[                                    ]] decided to purchase from [[     ]] rather than Whirlpool for non-price reasons in 2011 is unsupported by substantial evidence and not in accordance with law.  (Pl.'s Mot. 41-43.) Whirlpool asserts that the Commission did not sufficiently credit [[        ]] attempt to get Whirlpool to lower its bid price and [[        ]] strategy "'[[

]].'"  (Pl.'s Mot. 42-43 (quoting *Views* at 57).)  Whirlpool avers that these facts demonstrate that price played a key role in [[        ]] award of the sale to [[     ]].  According to Whirlpool, the ITC also failed to abide by 19 U.S.C. § 1677(7)(C)(iii)(V) and take [[        ]] dumping margin of [[        ]] percent into account in its lost sales analysis.  If the ITC had done so, it would have found that [[     ]] was able to present a competitive bid only by offering a dumped price, again demonstrating the key role that price played in [[        ]] decision.  (Pl.'s Mot. 42.)

##### ii.   Analysis

The Commission supported its conclusion that price did not play a significant role in [[                                                        ]] with substantial evidence, and did not unlawfully ignore [[     ]] dumping margin to reach this conclusion.  The ITC found persuasive the contention that [[        ]] would not consider [[        ]] for the portion of the [[           ]] pertaining to jumbo BMRs with slim in-door ice dispensers, representing [[                ]], because Whirlpool did not manufacture jumbo models or slim in-door ice dispensers.  *Views* at 59.  For the portion of the contract that [[

]], the Commission found it "significant" that "[[


[16]                                                                            ]]."

*Id.* (citing *Staff Report* at V-93).  Further, although [[                          ]] lower

per year than Whirlpool's, that figure amounted to a mere [[     ]] percent of the [[

                             ]], a difference which the ITC characterized as "not significant

relative to the other, non-price factors that prompted [[                              ]]."  *Id.*

at 59-60 (citing *Staff Report* at V-92).

        Whirlpool's insistence that 19 U.S.C. § 1677(7)(C)(iii) required the Commission to

incorporate [[     ]] dumping margin into its lost sales analysis is incorrect.  Section

1677(7)(C)(iii) states, in relevant part, that "the Commission shall evaluate all relevant economic

factors which have a bearing on the state of the industry in the United States, including, but not

limited to . . . (V) the magnitude of the margin of dumping" when performing an impact analysis.

19 U.S.C. § 1677(7)(C)(iii).  This court has held that "the statutory language does not dictate that

. . . [the] ITC demonstrate that dumped imports, through the effects of particular margins of

dumping, are causing injury."  *Iwatsu Elec. Co. v. United States*, 15 CIT 44, 48, 758 F. Supp.

1506, 1510 (1991); *accord Consol. Fibers, Inc. v. United States*, 32 CIT 855, __, 574 F. Supp. 2d

1371, 1380 (2008) ((citing § 1677(7)(C)(iii)(V)).  The Commission was not required to analyze

whether the [[     ]] percent dumping margin of subject imports from [[     ]] injured the

domestic industry.  By extension, the Commission certainly was not required to determine

whether the dumping margin alone, when weighed against all other evidence, caused [[     ]] to

---

16 "[[     ]]" refers to [[
    ]]."  *Staff Report* at V-91.

prevail against Whirlpool and [[                                    ]], as Whirlpool asserts.  Accordingly, the

court finds the ITC's lost sales analysis supported by substantial evidence and in accordance with

law.

### CONCLUSION

For the reasons provided above, the court grants in part and denies in part Whirlpool's

motion for judgment on the agency record and remands the *Final Determination* to the ITC for

further explanation of the potential double counting in its volume analysis and, to the extent

necessary, in the price depression analysis.  Specifically, the court affirms all findings in the

*Final Determination*, except for those dependent on the possible double counting of jumbo, four-

door BMRs.  The court orders the Commission to file its remand results no later than March 26,

2014.  The parties shall file any comments on the remand results no later than April 25, 2014,

and any response to the comments no later than May 12, 2014.



                                                                    /s/        Mark A. Barnett
                                                                           Mark A. Barnett
          Dated:   December 26, 2013                                          Judge
                   New York, New York